# GEORGE W. STOTLER et al. v. CHICAGO & ALTON RAILWAY COMPANY et al., Appellants.

**Division Two, June 11, 1907.**

1. **NEGLIGENCE: Neither Looking Nor Listening.** Notwithstanding the train was running at a very rapid rate (forty to fifty miles per hour) within the corporate limits of the city, in violation of an ordinance, and without ringing the bell or sounding the whistle, yet if a woman, driving an open buggy, in broad daylight, with an unobstructed view of forty or fifty feet between the houses and track as she approached the crossing, and with an unobstructed view down a straight track for more than a mile, drove her horse in a trot upon the track, without any effort to stop or to increase or decrease her speed, and without looking up the track in either direction or in anywise turning her head or listening, and was struck by the train just as the buggy got on the track, she was guilty of such contributory negligence as bars a recovery by plaintiffs for her death.

2. ———: ———: **Contributory Negligence.** Where the train could have been seen while deceased was yet in a place of safety, and one of two conclusions is inevitable, either that she did not look and heedlessly drove upon the track and was killed, or that she did look and saw the approaching train and attempted to cross ahead of it, she was guilty of such contributory negligence as bars a recovery by her children.

3. ———:. ———: ———: **Presumption Ordinance Was Being Obeyed.** If a traveler sees or has reason to believe that the train is being run in excess of the ordinance rate, he has no right to risk his life on the presumption that the ordinance is being observed. And where the traveler had an unobstructed view for forty or fifty feet before reaching the crossing, and the time was daylight and the buggy top was down, and the train could have been seen had she looked, and all the evidence on the issue as to whether or not she did look, though of a negative character, is that she did not look or attempt to look, there is no ground in the case on which to construct a rational presumption that she trusted the engineer was obeying the ordinance and so trusting concluded she could cross in safety.

4. ———: **Imputed Negligence.** A distinction is made between the mother's own positive contributory negligence which bars the right of her children to recover for her death, and the

imputed negligence of the minor daughter who was in the
buggy with her mother at the time her mother negligently
drove upon the track, in this case and the case of Eugenia
Stotler v. Railroad, 200 Mo. 107, the court holding in the daugh-
ter's case that the contributory negligence of the mother could
not be imputed to the daughter, who was not shown to have
any control over the horse, and in this case, where the mother
was the driver, that the plaintiffs' cannot recover because of
the mother's own contributory negligence.

Appeal from Audrain Circuit Court.—*Hon. A. H.
Waller*, Judge.

REVERSED.

*Scarritt, Scarritt & Jones* for appellants.

*P. H. Cullen, W. H. Logan* and *Walter Burch* for
respondents.

FOX, P. J.—From a judgment rendered in the
circuit court of Callaway county, Missouri, in favor of
plaintiffs, defendants appeal. This suit was originally
instituted in the circuit court of Audrain county on
July 18, 1903. The cause was removed upon the ap-
plication of the defendants Wiseman and Haines to
Callaway county, where it was finally tried at the Au-
gust term, 1904, of said court.

This is a suit by the minor children of Phoebe
Stotler to recover statutory penalty of five thousand
dollars for the wrongful killing of their mother. The
plaintiffs' petition states, in substance, that they are
minors under the age of eighteen and twenty-one years;
that their father and mother are dead, and that they
bring this suit by John W. Stotler, their duly ap-
pointed guardian and curator; that the defendant rail-
way company is incorporated under the laws of the
State of Illinois, and operates a railroad running from
Louisiana, Missouri, through the city of Laddonia, in

Audrain county, to Kansas City; that defendants Wiseman and Haines are residents of Missouri and employees of their codefendant, acting respectively as engineer and conductor of the train doing the injury. That on the — day of April, 1903, the deceased was driving a vehicle in Laddonia, Missouri, and that while driving north on a public road or street in said city, commonly called Pine street, which said street crosses defendant railway company's track in said city, and while said vehicle and the deceased were in the act of crossing the track they were struck by an engine and caboose owned by and under the control of defendants, running east on defendant's track, and the said Phoebe Stotler was killed. Plaintiffs then pleaded a violation of an ordinance of the city of Laddonia, which provides that it shall be unlawful for any railroad company or its agents, servants or employees to run upon its tracks or switches within that part of the corporate limits of said city where said railroad track, tracks or switches are unfenced, any locomotive, car or train of cars, at a rate of speed to exceed eight miles per hour. The petition further states that at and near said crossing the tracks of defendant are unfenced and that said crossing is in the corporate limits of said city; that it was the duty of defendants to have its locomotives and cars under full control and to keep a lookout for travelers when approaching said crossing; that defendant did not within eighty rods, or within any other distance of said crossing, ring the bell or blow the whistle on said train of cars and keep the same ringing and blowing until said engine had passed said crossing, but negligently and carelessly and unlawfully failed and refused to give any signals at all of the approach of said train at said crossing, and that the defendant saw and knew, or by the exercise of due diligence might have seen and known, that the deceased was in a perilous position and unaware there-

of, and unable to escape from the impending danger, and that they negligently failed to sound the usual and ordinary signals of danger in time to avert the injury, and negligently and carelessly failed to stop or slacken the speed of said train, when as a matter of fact by the exercise of due care they might have stopped or slackened the speed thereof in time to avert said injury; that the deceased at the time of her death was a widow and left no husband surviving her, and that the plaintiffs herein are her minor children and that they were dependent upon her for support.

In due time the railway company filed its petition and bond in the circuit court of Audrain county for the removal of the cause to the United States Circuit Court for the Eastern District of Missouri, on the ground of diverse citizenship between the defendant and plaintiffs and their guardian and curator. The petition further alleged that defendants Wiseman and Haines were residents of Missouri, and that they are fraudulently and improperly joined as parties defendant for the sole purpose of defeating the right of defendant company to such removal, and that plaintiffs' petition stated no cause of action against Wiseman and Haines; that the negligence alleged against Wiseman and Haines is nonfeasance only, and for which said defendants are liable only to the defendant company. The petition denies that plaintiffs have any cause of action against it or its codefendants, and avers that the defendants have a good and sufficient defense thereto, and even if the facts alleged in the petition are true, the liability, if any, exists against the defendant company only; that in pleading an ordinance of the city of Laddonia, plaintiffs do not allege that said ordinance had been accepted by the petitioner or its codefendants, and that said ordinance is merely penal and not binding on the defendants. The petition for removal of the cause was denied.

The defendants Wiseman and Haines filed a demurrer, alleging that the petition of plaintiffs does not state a cause of action against either of these defendants, that they are not necessary parties to a complete determination of the action and that there is a misjoinder of parties defendant. This demurrer was by the court overruled.

Thereafter, during the same term, defendants Wiseman and Haines filed their application for a change of venue, and the venue of said cause was by order of court changed to the circuit court of Callaway county, Missouri. In the circuit court of Callaway county defendant company filed what is termed by them a plea in abatement, in which the jurisdiction of the State court is challenged, and setting forth the various unsuccessful steps taken for the removal of the cause, together with the adverse rulings of the circuit court of Audrain county thereon, which plea in abatement was by the court overruled, to which the defendant company duly excepted.

The answer of the defendant company was a general denial and a further plea that the death of plaintiffs' mother was caused by her own contributory negligence and that of plaintiff Eugenia Stotler; the answer pleaded the unreasonableness and invalidity of the speed ordinance of the town of Laddonia and want of jurisdiction of the court grounded upon the application for the removal of the cause to the Federal court. The answer of defendants Wiseman and Haines consisted of a general denial and plea of contributory negligence.

The reply was a general denial.

The testimony developed at the trial of this cause was substantially the same as in the case of Eugenia Stotler against these same defendants, 200 Mo. 107, and tended to show about this state of facts: Laddonia is a small town of about seven hundred inhabitants

in Audrain county, about four miles east of Rush Hill. Most of its inhabitants live south of defendant railway company's right of way, which extends substantially in an easterly and westerly direction through the northern part of the land included in the city limits. On or about the 22d day of April, 1903, between six and seven o'clock, the deceased and her daughter were riding in a one-horse buggy, with the top down, going north on Pine street. At this crossing Pine street runs directly north and south. When at this crossing the hind wheels of their buggy were struck by a train, consisting of engine and caboose, running east on said track. In the collision the mother of the plaintiffs was killed. The crossing was the most frequented crossing in Laddonia. On the part of the plaintiffs the testimony tended to show that a number of dwelling houses are located on the west side of Pine street, and on the south side of the railroad, and that a few feet south of the right of way of the defendant company are two frame buildings, one of which is a story-and-a-half and the other a one-story building.

R. S. McKinney testified for the plaintiffs that he was surveyor of Audrain county. This witness made a plat of the crossing and measurements. He testified that a person would have to be within fifty feet of the tracks to get a view to the west.

C. A. Smith and J. A. Pierce also testified for plaintiffs. They state that they secured a horse and buggy and made some observation at the place where the accident occurred, as to distance, time and so forth. These witnesses testify that before one riding in an ordinary one-horse buggy could see to the west, the horse's head would be within thirty feet of the south rail of the main track. It was further shown that an ordinary buggy measures about nine feet from the seat to the end of the shaft, and that a horse's head

is usually about two or two and a half feet above the shaft.

T. Kidd testified for plaintiffs substantially as follows: That at the time of the accident he was traveling south on Pine street, about two blocks from the crossing; that his attention was attracted by the whistle of the train and that he saw the train about the time it struck the vehicle; that he did not hear a whistle sounded or bell rung prior to the time the train reached the cattle-guard and before the accident. In describing the manner in which the deceased approached the track this witness said: "She just came up in a slow trot; she drove up on the track; and it looked to me like the horse just slacked up a little when the train struck the buggy. Q. Where was the horse at the time you say it slacked up a little? A. The horse was right on the track. Q. Up to that time state whether or not she had stopped, so far as you know? A. I didn't see her stop. Q. What part of the outfit was struck? A. It looked to me like it struck about the center of the buggy. Q. She went on in a slow jog up to that time, when the horse checked up a little when it got on the main track, and then went over? A. Yes, sir. Q. Did you see her turn her head and look in any direction as she approached the track? A. No, sir; I didn't notice her turn her head at all." This witness testified that the train was running at least thirty or forty miles an hour at the time of the accident. One of the witnesses for the plaintiffs estimated the speed of the train at the time of the accident at from sixty to eighty miles per hour, while the other witnesses estimated it at from forty to sixty miles an hour. After the accident the engine ran down past the second elevator east of the depot. From the crossing to the elevator mentioned the distance was shown to be 842½ feet, and the depot

204 Sup—40

was located 221 feet and eight inches east of the cross-ing.

Wm. O. Montague testified for plaintiffs substan-tially as follows: That he was nineteen years old and that his occupation was a farmer and that he lived in Audrain county, near Laddonia, and had lived there all his life; that at the time of this accident he was at the house of a neighbor, southwest of the crossing, a distance of between half a quarter and a quarter of a mile, and that when he first noticed the train it was a little east of Rush Hill, which is four miles from the station of Laddonia; that when his attention was called to the train he noticed it continuously until it passed out of his view behind a barn; that the distance from the barn to the center of the street or crossing where the accident occurred is about one hundred or one hundred and fifty yards, but that he had not meas-ured it; that he did not hear a bell rung or whistle sounded by the engine until just as it was going be-hind the barn; that he did not see the accident and could not see the crossing from where he was located. This witness stated that the track or country between Rush Hill and Laddonia is an open prairie country.

Plaintiffs also offered evidence tending to show that on the trial of the case of Eugenia Stotler against these defendants, defendants Wiseman and Haines tes-tified that the speed of the train at the time it struck the buggy in which the deceased and Eugenia Stotler were riding was from twenty-two to twenty-five miles an hour.

On behalf of the defendants, L. S. Simpson tes-tified that he was the night telegraph operator at Lad-donia at the time of the accident; that there was a semaphore signal at the depot at Laddonia and that when the engine which struck and killed Mrs. Stotler was approaching the corporate limits of the city of Laddonia from the west this signal indicated an order

to stop; that he was in the depot when he saw the
train approaching and when they reached the general
whistling point the engine gave a signal for the station,
which is one long whistle; that he had no orders for
them and gave them the order to proceed which was
done by holding down the arm of the semaphore signal,
and that the engineer answered it by two short whistles.
This witness stated that the engine was at the usual
whistling post, which is about a quarter of a mile west
of the crossing, when the signals were given. He fur-
ther states that when the engine passed the depot the
brakes were applied and that they seemed to be try-
ing to stop it.

Defendants also offered evidence by two civil engi-
neers, tending to show from surveys made by them
that there was nothing to obstruct the view of a per-
son walking or driving in a vehicle, such as Mrs. Stotler
occupied, from a point sixty-three feet south of the
south rail of this track, up to the track, of a locomotive
approaching from the west for a distance of two miles;
that a person riding as the deceased was could see the
rails of the railroad track from the time she was
within sixty-three feet of the south rail of the main
track until she reached it, for a distance to the west
of at least two thousand feet; that the right of way of
the railroad, which is one hundred feet wide west of
the public road where the accident occurred, is fenced
on either side for several miles west of Laddonia up
to within about one hundred and twenty feet of the
road where the accident occurred, at which place there
is a cross-fence with a cattle-guard at the track, and
that the track west of the crossing is exactly straight
for a mile or more; that the right of way at that
place runs from the west a little north of east and
the public road runs about north and south; the pub-
lic road crosses the railroad track at grade, and that
there is a very slight slope of about a foot upward as

you approach the track from either side for a distance of about fifty feet.

This is a sufficient reference to the facts developed at the trial to enable us to determine the legal propositions disclosed by the record. At the close of the evidence defendants requested an instruction in the nature of a demurrer, directing the jury, under the pleadings and evidence, to find the issues for defendants. This request was denied. The court then submitted the cause to the jury upon instructions covering the entire case. The jury returned a verdict finding the issues for the plaintiffs, and assessing the statutory penalty in the sum of five thousand dollars. Timely motions for new trial and in arrest of judgment were filed and by the court overruled. Judgment was rendered in accordance with the verdict for the amount of the penalty assessed by the jury and from this judgment defendants in proper form and due time prosecuted their appeal to this court and the record is now before us for consideration.

OPINION.

The record before us in this cause discloses the assignment of numerous errors, but it is manifest that there is but one vital proposition confronting us for consideration, that is, under all the evidence disclosed by the record are the plaintiffs entitled to recover, and did the trial court commit error in denying the instruction at the close of the evidence in the nature of a demurrer directing the jury to find the issues for the defendants? The controlling facts in this cause as is indicated in the statement of the cause are substantially the same as the facts developed in the case of Eugenia Stotler against these same defendants, 200 Mo. 107. The testimony in this case tends to show and it must be taken as establishing beyond dispute the fact that the defendants at the time and place of the accident were operating this engine and car at

a rate of speed in violation of the ordinances of the town of Laddonia. As to the rate of speed there is a conflict of testimony, some of the witnesses fixing it between thirty and fifty miles an hour, others between twenty-two and twenty-five, and one witness between sixty and eighty miles an hour; however, we are inclined to the opinion that the weight of testimony shows that the engine was running between forty and fifty miles an hour.

The testimony on the part of the plaintiffs shows that the deceased, in the language of the witness who saw her approaching the track, drove up on the track in a slow trot and that she did not slack up until the train struck the buggy; she did not stop, and the only eye-witness says that she went on in a slow jog up to the time when the horse checked up a little when it got on the main track. This witness further says, and he was watching the accident, that he did not notice her turn her head at all, and in his opinion the train was running at least thirty or forty miles an hour at the time of the accident. The testimony is also undisputed as to the fact that the deceased and her daughter were riding in a one-horse top buggy, that the top was down, the mother doing the driving. There is some conflict in the testimony as to the distance from the crossing of the main track where the accident occurred, which bears on the point that the deceased and her daughter could have an unobstructed view to the west and see an engine approaching; however, the testimony on the part of the plaintiffs shows that when they were within forty or fifty feet of the track they would have a view of the track and if they were looking could easily see an engine approaching the crossing. There was other testimony tending to show that they had an unobstructed view of the approach of the engine to this crossing, that is to say, between sixty and sixty-five feet. That the deceased, had she been looking, could have seen

this engine approaching the crossing where she was killed, when she was forty or fifty feet from the track, the testimony leaves no ground for dispute. Witness T. Kidd, who testified in behalf of the plaintiffs, was the only person who saw the accident and he thus describes it: ''She just came up in a slow trot, she drove up on the track, and it looked to me like the horse just slacked up a little when the train struck the buggy. Q. Where was the buggy at the time you say it slacked up a little? A. The horse was right on the track. Q. Up to that time state whether or not she had stopped, so far as you know? A. I didn't see her stop. Q. What part of the outfit was struck? A. It looked to me like it struck about the center of the buggy. Q. She went on in a slow jog up to that time, when the horse checked up a little when it got on the main track, and then went over? A. Yes, sir. Q. Did you see her turn her head and look in any direction as she approached the track? A. No, sir; I didn't notice her turn her head at all.''

We have in this case, when the facts as disclosed by the record are analyzed, an engine running at a very rapid rate of speed approaching the crossing, and Mrs. Stotler, the deceased, driving in a buggy with the top down, in broad daylight, with a plain, unobstructed view of the approach of the engine at least forty or fifty feet before she reached the crossing, driving the horse in a trot, making no stop, and so far as the witness who was looking at the occurrence saw, did not turn her head at all, drove up on the track and was then struck and killed by the engine being operated by the defendant's servants and employees; therefore, the simple question confronts us, are the plaintiffs entitled to recover under that state of facts?

In the case of Eugenia Stotler against these same defendants, for the recovery of damages for injuries received in the same accident now under consideration,

this court, In Banc, affirmed the judgment, and while
the esteemed and learned judge in expressing the views
of this court as applicable to that case, disclaims any
intention to decide any cause which might arise from
the death of the mother in the same accident, and while
it is true, as stated, that the cause of action resulting
from the death of the mother was not decided, yet it
is apparent that the controlling facts in the two cases
could not be separated.   The main defense in the
Eugenia Stotler case was that her injuries were in-
flicted by reason of the negligence of her mother, and
that she participated in or at least acquiesced in her
mother's negligence in driving upon the track in front
of the approaching engine, and was therefore equally
guilty of contributory negligence. In other words,
we are unable to see how this court, In Banc,
could determine the case of  Eugenia Stotler
without discussing the facts applicable to the
negligence of the mother.   It being conceded
that the facts in the case at bar are substantially
the same as in the Eugenia Stotler case, and if the
conclusions as announced in that case, which were
clearly applicable to the acts of the mother at the
time of this accident, are to be followed, we see no
escape from the result that the judgment in this cause
must be reversed. The Eugenia Stotler case was de-
cided by the Court In Banc and was concurred in by
all the members of this court. It carefully discusses
all the facts and exhaustively reviews all the authori-
ties as applicable to them, and no one can read the
opinion and escape the conclusion that the Court In
Banc, under all the evidence in respect to this acci-
dent, regarded the acts of the mother, Mrs. Stotler, as
constituting such negligence as would bar a recovery
in an action for her death.   An analysis of the con-
clusions announced in that case will demonstrate that
the affirmance of the judgment in favor of Eugenia

Stotler was only affirmed upon the theory that she did not participate in and was not responsible for the negligence of her mother. After discussing the facts and reviewing all the authorities upon the subject in hand, the conclusion was thus stated: "Now, if this case be viewed from the standpoint of plaintiff's evidence, she is presumed to have looked and listened and to have seen and heard the train. If it be viewed from the standpoint of defendants' evidence, she actually did see the train when it was forty rods away, and she was still in a place of safety south of the track. The case, then, has progressed to the point where fault can be found with plaintiff, if at all, not in her not looking and listening, in her not seeing and hearing the advancing train, but in the act of driving on the track immediately before that train. The act in question was not hers; but if she actively participated in that act, or is responsible therefor, she ought not to recover. If she did not actively participate therein, and is not responsible therefor, then there is no independent cause intervening between defendants' negligence and the injury, and that injury should be referred to defendants' negligence alone." Following this the court then gave particular stress to the theory that Eugenia Stotler was not responsible for the negligence of her mother, and fully discussed the reasons why she should not be held responsible for such negligence, and finally concluded by saying, concerning the conduct of Eugenia Stotler on that occasion, that "the truth is, she was but a broken branch cast on the stream of the mother's judgment and volition, prone to be borne away on its current; and, under such circumstances, defendants may not acquit themselves by pointing to the mother's fault."

It is manifest that there can be but one logical conclusion from what was said by the Court In Banc in that case, and that is, under the facts developed at

the trial, which were substantially, as is conceded by
counsel for plaintiff, the same as in the case at bar,
by reason of the negligence of the mother, Mrs. Stotler,
driving upon the track in front of an approaching en-
gine there could be no recovery in an action against
the defendants in causing her death. The conclusion
as to the acts of Mrs. Stotler being negligent, as is
clearly indicated in the case of her daughter, is fully
supported by numerous well-considered cases in this
State.

In Hayden v. Railroad, 124 Mo. 566, plaintiff
sought to recover damages for the death of her hus-
band who was struck and killed by one of defendant's
passenger trains on a public road crossing. . The peti-
tion charged that his death was caused by the negli-
gence of the defendant in allowing prairie grass and
weeds to grow upon its right of way and near said
crossing, so as to obstruct the view of its tracks and
in failing to sound the whistle or ring the bell on the
approach of its train to said crossing, as required by
law. The answer was a general denial and a plea of
contributory negligence. The evidence tended to show
that the servants of the railroad company were negli-
gent in failing to give signals, but it also tended to
show that the deceased could have seen the train by
looking. The husband of plaintiff was driving a two-
horse team to a wagon and could have seen the ap-
proaching train when it was from fifteen to thirty feet
of the crossing. At the close of all the evidence the
court sustained a demurrer thereto and plaintiff ap-
pealed. The court in that case stated that the train
was traveling ten times as fast as deceased and that
when he was in fifteen, twenty, twenty-five, or thirty
feet from the crossing the train must have been within
a distance of one hundred and fifty to three hundred
feet of the crossing. The court then fully reviewed the
facts and held that the testimony showed clearly that

notwithstanding there was high grass intervening be-
tween the plaintiff's husband and the train, that by
the turning of his eye when in fifteen or twenty feet
of the crossing he could have seen the train approach-
ing, which was one hundred and fifty or three hundred
feet away, and that his failure to observe the approach
of the train and proceeding in his way across the track
was such negligence as would bar recovery, and this
court said in that case that "though the defendant may
have been negligent in failing to give the signals for
the crossing, and in permitting the high grass to be
upon its right of way, yet the deceased having lost
his life through his own negligence in failing to dis-
charge the duty imposed upon him by law, in his situa-
tion, the plaintiff cannot recover for his death."

In Huggart v. Railroad, 134 Mo. l. c. 679, GANTT,
P. J., speaking for the court, said: "It is an uncon-
tradicted and conceded fact that when he reached a
point from thirty to forty feet from the track, a point
where he was free from all danger of collision with
trains upon the road, he could have seen up the track
to the west a distance of six hundred and possibly
one thousand feet. As a physical fact that train was
then in sight. One of two conclusions is inevitable:
He either did not look, and heedlessly rode upon the
track and was killed, or he looked and saw the ap-
proaching train and attempted to cross ahead of it.
In either case he was guilty of such contributory neg-
ligence as bars a recovery by his widow. Porter Hug-
gart is dead. We have no explanation of his conduct
in attempting to cross the track in the face of a rapidly
approaching train, but in view of the physical im-
possibility of his failing to see the train, had he looked
to the west as it was his clear duty to have done, while
yet out of danger, the law denominates his conduct in
going upon the track and attempting to cross as con-
tributory negligence. There can be no presumption of

ordinary care in the face of such facts to the contrary and without explanation. [Hayden v. Railroad, 124 Mo. 566; Kelsay v. Railroad, 129 Mo. 362; Lane v. Railroad, 132 Mo. 4.]"

In Sanguinette v. Railroad, 196 Mo. 466, this court, speaking through Judge Burgess, denied plaintiff a recovery on the ground of negligence in attempting to cross the defendant's railroad track in front of an approaching train, for the reason that proper care and caution was not exercised in listening and looking for the approach of such train. In this case the rule as announced in 3 Elliott on Railroads, section 1165, was quoted approvingly. It is there said: "As a railroad track is a warning of danger, one who attempts to cross it must act with care proportionate to the danger and not suffer his attention to be diverted from the danger before him, and he must keep his faculties in active exercise. It is his duty to keep his faculties in condition for exercise and to exercise them. Mental absorption or reverie will not excuse the traveler who omits to perform the duty of looking and listening. If the traveler could have seen the train by looking, the presumption is that he did not look, or if he did look did not heed what he saw. This presumption, in conjunction with the fact that the courts judicially know that great throngs of persons daily cross railroad tracks without receiving injury, renders necessary and logical the conclusion that prima-facie an accident at a crossing is attributable to the negligence of the traveler. A traveler who knows that a train is due must take care to avoid it, and this knowledge imposes upon him a somewhat higher exercise of care than if he was not in possession of such knowledge. Principle requires that in such a case a person who attempts to cross the track should be held guilty of negligence as matter of law if there are obstructions to sight or hearing,

since no one can be said to exercise ordinary care who voluntarily encounters a danger that he knows is imminent, unless the situation and conditions are such as to enable him to see that he can proceed with safety. Analogous cases emphatically affirm that one who assumes to proceed upon a calculation of chances is guilty of negligence, and the rule established by those cases applies to such cases as we have mentioned."

In Schmidt v. Railroad, 191 Mo. l. c. 228, Judge GANTT thus stated the rules of law applicable to the subject under discussion: "It is a settled law of this State that a person who goes upon a railroad track or proposes to cross it, must use his eyes and ears to avoid injury. And while a neglect of the regulations in regard to the running of trains amounts to negligence in law on the part of the railway company, this does not absolve pedestrians and others who propose to cross the tracks from the exercise of ordinary care. Every intelligent person who has arrived at years of discretion, is presumed to know that it is dangerous to be upon a railroad track when trains are passing to and fro, and when crossing one, he is expected to be vigilant and watchful of the approach of the locomotive. The failure to exercise such vigilance is negligence *per se*. [Harlan v. Railroad, 64 Mo. 482.] The law that a traveler, before entering upon a railroad track, must observe some caution for his own safety, and that a failure to do so will be such negligence as will preclude a recovery in case of injury, is as well settled in this State as is the law that a railroad company is guilty of negligence in running a train without observing the reasonable precaution required by law or ordinance. The measure of precaution to be observed by a traveler depends often upon the circumstances and surroundings. The general rule is that in knowingly approaching the track of a railroad, he must use his sense of sight or hearing to ascertain if there be danger. If the

view is so obstructed that he cannot see, he should carefully listen. The circumstances may not require that he both look and listen, but common prudence requires that he do either one or the other, and a failure to do so renders his act negligence in law. The rule of contributory negligence is not changed or abrogated by reason of a statute or ordinance imposing the duty on account of the violation of which the injury resulted. [Weller v. Railroad, 120 Mo. 653.] The statute does not absolve persons approaching a public railway crossing from exercising common prudence to avoid danger, nor shift the responsibility to another should injury ensue from the failure to exercise it. [Kenney v. Railroad, 105 Mo. 284.]''

In Boring v. Railroad, 194 Mo. 541, the testimony tended to show that the plaintiff did not stop or look to see if a car was approaching from the east, from the time he left the sidewalk at the northeast corner of Cherry and Fifteenth streets until the moment the car struck him. The distance between the point where he made the turn, at the northeast corner of said streets, and the point where he attempted to cross the track was but comparatively a few feet, and there is no evidence tending to show that the gripman could, by the exercise of due care and diligence, have stopped the car in time to have prevented the accident. BURGESS, J., in announcing the conclusions of this court, said: ''The evidence shows that the plaintiff was unobservant, careless of his safety, and walked into danger. There is nothing disclosed by the record which would justify the submission of the cause to the jury.''

In Reno v. Railroad, 180 Mo. 469, this court again said in discussing the proposition now under consideration, that, ''from the testimony of plaintiff, and that given in her behalf, one of two inferences must be drawn, either that plaintiff saw the car and attempted to pass in front of it, or that she did not look for the

car's approach and attempted to cross over the tracks in disregard of it, and in either case, she was guilty of negligence which at least contributed to her injury.''

In Kelsay v. Railroad, 129 Mo. l. c. 372, Judge MACFARLANE, in treating of this proposition, stated the rule in this way, that, ''the duty of a traveler upon a highway, in approaching a railroad crossing, to use all reasonable precautions to ascertain the approach of trains and to avoid injury by them is well-settled law, not only in this court, but perhaps of all the courts of this country. This rule imperatively requires him to look carefully, in both directions, at a convenient distance from the crossing, before venturing upon it, if, by looking, a train could be seen. The duty will not be performed by attempting to look only from a point at which the view is obstructed. The duty is a continuing one until the crossing is reached. If there is a point between the obstruction and the track which gives opportunity to see, it is the duty of the traveler to look. He cannot close his eyes and thereby relieve himself of the consequences of his own neglect. [Hayden v. Railroad, 124 Mo. 566.]'' The esteemed and learned judge, in further discussing the proposition in hand, approvingly made this quotation. He said: ''It was said in a recent case: 'It is simply and flatly impossible that one can stop, look, and listen for an approaching train that is in plain view and close at hand and be unable to see or hear it, if he possesses the senses of sight and hearing. It seems, therefore, necessary to advance one step in the application of the doctrine of legal presumption, and to lay it down as a rule that one who is struck by a moving train which was plainly visible from the point he occupied, when it became his duty to stop, look, and listen, must be conclusively presumed to have disregarded that rule of law and of common prudence, and to have gone negligently into an obvious danger. A line of well-consid-

ered cases leads fairly up to this conclusion.' [Myers
v. Railroad, 24 Atl. 747.]''

There are numerous other cases in this State an-
nouncing the same rule as is indicated by the foregoing
quotations. [Walker v. Railroad, 193 Mo. 453; Stepp
v. Railroad, 85 Mo. 229; Mockowik v. Railroad, 196
Mo. 550; Hixson v. Railroad, 80 Mo. 340; Kelly v. Rail-
road, 88 Mo. 534; Lenix v. Railroad, 76 Mo. 86; Harlan
v. Railroad, 64 Mo. 480; Zimmerman v. Railroad, 71
Mo. 476.]

Learned counsel for respondents makes a very
strong presentation upon his theory of this cause, and
undertakes to distinguish the cases herein referred to
from the case at bar. It is earnestly insisted by re-
spondent that the deceased, Mrs. Stotler, had a right,
under the facts developed at the trial of this cause, to
presume that the defendants were obeying the ordinan-
ces of the town of Laddonia and were not operating
the train at a speed in excess provided by such ordin-
ances; therefore, contributory negligence, under the
circumstances, should not be attributed to her. In
responding to this contention it is sufficient to say that
the recent case of Green v. Railroad, 192 Mo. 131, fur-
nishes a complete answer. In that case it will be ob-
served that the train was being operated at a rate of
speed in excess of the provisions of the ordinances of
the town of Pacific. It was insisted by counsel in that
cause, as is contended in the case at bar, that the de-
ceased had the right to invoke the presumption that
the train was not running in violation of such ordinan-
ces, and the case of Hutchinson v. Railroad, 161 Mo.
246, was cited and relied upon by counsel as maintain-
ing that doctrine. VALLIANT, J., speaking for the court,
very clearly draws the distinction between the cases,
and he thus answered the contention of the respondent
in that case: ''The facts in this case are very dif-
ferent from those in Hutchinson v. Railroad,

161 Mo. 246, to which we are referred. In that case it was after dark in the evening, the deceased heard the whistle and saw the headlight of the engine about half a mile distant when she started across the tracks; if the engine had been running within the six-mile speed limit she would have had ample time to cross, even pausing as she did to pick up a scarf she had dropped. The court held that, in the absence of proof that she knew or had reason to apprehend to the contrary, she had a right to presume that the engineer was observing the ordinance and to regulate her movements accordingly. But the accident we are now discussing did not occur at night; it occurred at nine o'clock in the morning, and the plaintiff's witnesses say that they saw that the engine was running at a high rate of speed. There was not one of them shown to be more competent to judge of the speed than the deceased; the only difference in that respect between them and her was that they looked and she did not. If one sees or has reason to believe that the engine is running in violation of the speed ordinance he has no right to risk his life on a presumption that the ordinance is being observed. There is in this case no ground on which to construct a rational presumption that the deceased trusted that the engineer was obeying the ordinance. There is no evidence on which we can base a finding that she saw the engine at all until in the moment of peril. It was imminently, dangerously close when she stepped on the track. All the eyewitnesses say she was coming fast, she put her foot over the rail and in that instant the engine struck her. She was probably in a hurry to overtake her friends who had gone on ahead and she was possibly in a state of nervous excitement at having to pass so close to the front of the throbbing freight engine, but however that may be, and whatsoever the cause, she forgot to look at the danger into which she was running.''

So it may be said in this cause, applying the same ruling as was employed in the Green case, that this accident occurred in broad daylight, and that numerous witnesses testified for the plaintiff that they saw that the engine was running at a high rate of speed, and it is apparent that Mrs. Stotler, when in from forty to sixty feet of the main track, if she looked and saw the engine approaching, was just as competent to judge of the speed and even more so, located as she was, than any of the witnesses who testified in her behalf. The testimony simply shows that she was driving the horse in a buggy, with the top down, in a trot, and that she never checked the speed, and there seemed to be no checking of it until she was on the track and struck by the engine. The testimony of the only eyewitness to this accident rather indicates that she never looked one way or the other in respect to seeing the approach of an engine. While this testimony is of a negative character, he says that he was looking at her and that he did not see her turn her head to look at all and did not see her make any step or check the speed of her horse. We take it that the care and caution that is required of a traveler in crossing a railroad track simply means practical and common-sense prudence, before undertaking to cross a dangerous place, and confronted with the manner in which Mrs. Stotler drove upon this track, it would be doing violence to the meaning of the terms "prudence and caution" to say that, if she saw that train approaching as it did approach this crossing at a very rapid rate, she was exercising any prudence or caution whatever, under the conditions confronting her, to undertake to hurriedly drive across the track in front of a rapidly approaching engine. As was said by Judge VALLIANT in the Green case, "there is in this case no ground on which to construct a rational presumption that the deceased trusted that the engineer was obeying the ordinance."

As before stated, she never stopped, and in our opinion the ordinances fixing the rate of speed or the rate of speed at which the engine was being operated, never entered her mind. If she saw this engine approaching this crossing when she was from forty to fifty feet of the main track, common practical prudence and caution would certainly have dictated the waiting of only a few seconds for the engine to pass and this accident would have been avoided.

We are unwilling to say, under the conditions confronting Mrs. Stotler, an engine approaching the crossing at a very high rate of speed, which was just as apparent to her as it was to the witnesses who undertook to fix the rate of speed, that it was the exercise of even the most ordinary care and prudence to undertake, under the circumstances, while rushing along to cross the tracks, by mental process or reasoning, to figure out how long it would take the engine to reach the crossing. Under the facts disclosed in this record, the exercise of ordinary practical prudence and caution would have required her to stop until the engine passed.

We have indicated our views upon the controlling propositions disclosed by the record, which renders it unnecessary to discuss the other complaints urged by the appellants. Entertaining the views as herein expressed, it results in the conclusion that the judgment of the trial court should be reversed, and it is so ordered.

All concur.