# MARY F. RODAN, Appellant, v. ST. LOUIS TRANSIT COMPANY.

### Division One, November 27, 1907.

1. **ONE NEW TRIAL: Discretion.** The granting of a new trial rests within the sound discretion of the trial court; and its action in that regard will not be disturbed on appeal, unless it appears that its discretionary power was abused, that is, exercised in an arbitrary or improvident manner.

2. **EVIDENCE: Testimony Before Coroner.** Testimony before the coroner as to what deceased was doing at the time and immediately before he was struck by the street car, is not substantive evidence on the trial of the damage suit; its force is spent in showing contradictory statements to impeach the witness.

3. ————: **Impeaching One's Witness.** If plaintiff put a witness on the stand to prove a certain fact, he cannot impeach him; by the act of putting him on the stand he vouches for his truthfulness.

4. **NEGLIGENCE: Instruction: Looking: Presumption: Evidence.** Where there is testimony for plaintiff that deceased did not look or listen for the approaching car before attempting to cross the track in front of it at a crossing, which on cross-examination is contradicted, an instruction which tells the jury that unless they find from the evidence that he did not look or listen they are at liberty to presume he did look and listen, is error. Such an instruction is a hint to the jury to disregard the witness's testimony, and indulge a presumption based on the assumed absence of his testimony.

5. **PRESUMPTION: Evidence.** When the evidence is contrary to the presumption invoked, the presumption itself cannot be laid hold of for use in administering justice in a particular case. Where there is positive evidence on plaintiff's part both that deceased did and that he did not look and listen before attempting to cross the railway tracks in front of an approaching car, the jury cannot be instructed to indulge a presumption that he did look and listen.

Appeal from St. Louis City Circuit Court.—*Hon. O'Neill Ryan*, Judge.

AFFIRMED.

*Campbell & Thompson* for appellant.

Plaintiff's instruction 7 was proper, and the court erred in granting a new trial because such instruction was given. Weller v. Railroad, 164 Mo. 205; Riska v. Railroad, 180 Mo. 168; Eckhard v. Railroad, 190 Mo. 593; Mockowik v. Railroad, 196 Mo. 511; Railroad v. Landrigan, 191 U. S. 461.

*Boyle & Priest, Morton Jourdan* and *Edward T. Miller* for respondent.

Plaintiff's instruction 7, for giving which the trial court confessed error, was clearly erroneous. Schmidt v. Railroad, 191 Mo. 215; Mockowik v. Railroad, 196 Mo. 550; Porter v. Railroad, 199 Mo. 82.

LAMM, J.—Plaintiff, widow of Philip Rodan, sued for statutory damages for his alleged wrongful death at the hands of defendant. Recovering a judgment for $5,000 at a jury trial, presently the trial court, on motion, ordered her judgment set aside. She appeals from that order.

Her right of action is grounded, *first,* on the general charge that as her husband was passing between six and seven o'clock on the morning of the 28th of November, 1903, over the crossing of Walton and Delmar avenues, public streets in St. Louis, the defendant's servants in charge of an electric car running west on Delmar avenue so negligently and carelessly ran, controlled and managed said car as to cause it to run against said Rodan, thereby injuring him so that he died; *second,* that defendant through its servants in charge of its said car negligently and carelessly ran it over the crossing of a public street at a great and dangerously high rate of speed and without giving any warning or signal by bell or otherwise of

the car's approach, thereby contributing to cause the death of plaintiff's husband; *third,* that there was a speed ordinance in force in St. Louis limiting the speed of the car in question at the time and place to a maximum of fifteen miles per hour, and that in violation of this regulation defendant was running its car in excess of fifteen miles an hour and thereby contributed to cause the death of her husband; and, *fourth,* that there was an ordinance in force in St. Louis at the time, known as the Vigilant Watch Ordinance, and that defendant violated the terms of this ordinance in specified particulars and thereby contributed to cause the death of her husband.

The answer was a general denial and a plea of contributory negligence in going upon the track directly in front of a moving car.

The reply put in issue the defense of contributory negligence.

Plaintiff's case on the facts is this:

A sixty-foot street in St. Louis, known as Delmar avenue, runs practically east and west at the point of the accident. Walton avenue runs north and south and intersects Delmar at that point, practically at right angles. Standing at this intersection one can see east on Delmar, say, two blocks to Taylor, and west, say, three blocks to King's Highway. Going west Delmar approaches Walton on a down grade—from thence on the grade is up. All the evidence tends to show that Philip Rodan had either come south on the west side of Walton, or was standing at the northwest corner, and from thence he apparently passed south, on the west side of the intersection, directly across defendant's track laid on Delmar. From his starting point (the curb) it was seventeen feet to the north rail of the track on which the car ran. Two tracks were laid on Delmar—one for west-bound and one for east-bound cars—the south track, as we infer, was for the latter.

Rodan was struck by a west-bound car and, therefore, on the north track. He was unconscious when picked up, bleeding from a gaping wound in his head and presently died.

The time was between half past six and a quarter to seven on the morning of November 28, 1903. No witness saw Rodan that morning before he was struck, save one Joe Edwards, on whose testimony the case somewhat turns, and whose testimony will hereafter be set forth in detail. A good many passengers were aboard, among them several officers.

The speed of the car was variously estimated, some gauging it by the expression "pretty fast;" others by the expression "terrible rate of speed;" and still others, who seem qualified to speak, putting it at twenty-five miles an hour. Evidence was put in tending to show that the car was equipped with brakes and a reverse lever, and that it could have been stopped, going at twenty-five miles an hour, by the use of brakes and without the reverse in 135 feet, and with the reverse in one hundred feet. Going fifteen miles an hour, it could have been brought to a standstill by the brakes alone in from seventy-five to eighty feet, and with the reverse in from fifty to fifty-five feet.

As to signals, there was evidence put in tending to show that no gong was rung or bell sounded as the car approached the intersection. This character of testimony varied as usual. Some of the witnesses were paying no attention to signals and heard none; others were alert and heard none.

The state of light may be got at from a variety of descriptions. For instance, there was testimony that the gas lamp was still burning at the northwest corner of the intersection at the time he stepped from that corner. One witness said "it was pretty light, it was not very dark." Another said, "It was good dawn day; one could see a man quite a distance; . . . well,

I judge you could see a man a block off.'' One witness, a passenger, testified that when the car finally stopped, nearly a block beyond the intersection, he stood up and, looking back out of the rear of the car, saw Rodan lying in the street and could tell within an ''inch'' at that time in the morning where he was lying—''had a plain view.'' And it may be said that it was substantially shown by the preponderance of the evidence that the outline, the form, of a man could be distinguished at that distance, to-wit, from 150 to 300 feet, though one witness described the morning as ''hazy,'' and another as ''misty.'' It was in evidence, too, that milkmen were delivering milk to their morning customers at the time.

It was shown that the collision produced a jar to the car and shivered and smashed the glass in its vestibule, the broken bits clattering down over the floor. This crash or jar was heard, or felt, by the passengers, and heard by others not passengers, who did not see the collision. The motorman was riding in the vestibule, and all the testimony tends to show it was shut off from the body of the car and the curtains were down over the windows in the partition, so that passengers could not see directly west, that is, out in front. Whether the curtains were down at the side windows so as to interrupt the view out and in front therefrom remains undisclosed from any witness save Edwards, who claims to have looked out of the side windows towards the front and to have seen Rodan. Whether the car was lit up remains in doubt—some witnesses hazarding a guess that it was, and others having no recollection one way or the other.

The distance the car ran after striking Rodan is put by some at a block; by some at something less; by others at about half a block; and some say it ran two or three car-lengths. No witness felt the reverse going on before the collision; and the evidence tends to es-

tablish the fact that the car was not checked prior to
the collision and he crash. Exclamations were put in
from the motorman as a part of the *res gestae*, thus:
"A man run right in front of my car;" and a man
"stepped into my car."

There was evidence that Rodan was knocked seven-
ty-five feet, other evidence puts it at fifty feet, and still
other evidence at thirty feet. One witness (a bystand-
er) testified that when he heard the crash he lifted his
eyes and saw "something rolling like a ball" for twen-
ty-five feet. It was shown that Rodan was knocked
west and south over all the tracks, and lay a few feet
from the south rail of the east-bound track on Delmar.

To further make out her case, plaintiff put one
Joe Edwards on the stand, who testified he got on the
car somewhere east of Walton and was on his way to
his work at a livery stable. He heard no gong after
the car left Taylor. As this witness either assigns him-
self the role of the only eye-witness, or toys with that
role as an understudy, and as stress is laid upon his
testimony by the trial court in sustaining the motion
for a new trial, it will serve a useful purpose to let por-
tions of his testimony run by questions and answers,
thus:

"Q. Where were you sitting? A. Sitting about
three seats from the front end of the car.

"Q. And the curtain was raised in front of you?
A. No, sir; the curtains direct in front of me were
down.

"Q. Could you see out in front? A. Yes, sir, I
could see from the side window.

"Q. Could you see from the side and front? A.
Yes, sir.

"Q. You were on the third seat from the front?
A. Yes, sir. . . .

"Q. Did you see a man approaching the track?
A. Yes, sir.

"Q. How far away was the car from the man when you first saw him step into the street? A. About 150 feet.

"Q. About 150 feet away? A. Yes, sir.

"Q. State what the man did; was he approaching the car? A. *He was going south on Walton avenue, crossing the tracks.*

"Q. State how he did; did he proceed on across the track? A. *He just proceeded on across the tracks.*

"Q. And the car was approaching at this rate of speed? A. Yes, sir. . . .

"(By Mr. Thompson) State what happened? A. The car was going, I guess, at the rate of twenty-five miles an hour, going west on Delmar; *when I first saw the man, he was going south on Walton; I seen him as he left the sidewalk underneath the gas light; he was going on across; he didn't pay no attention because there was nothing to attract attention to the car;* I didn't hear anything of the gong after leaving 4500. . . .

"Q. *Go ahead; you say you saw the man as he stepped in the street?* A. *Yes, sir.*

"Q. *What happened?* A. *Just as he gets in the track the car was right upon him; it hit him; the car couldn't stop where it was on him, it was running so fast just at that time, the car hit him and I heard the noise of the glass breaking in front of the car.*

"Q. Just at that moment that the man was hit, I suppose you did not see him? A. No, sir; I couldn't see him, but I saw him when he came from the sidewalk.

"Q. *You saw him as he stepped on the track?* A. *Yes, sir;* and I heard the noise of the glass breaking, the car didn't stop until it gets about twenty feet east of Bayard avenue, that is about twenty-five feet west of the feed store and the confectionery store.

"Q. How far was the body knocked? A. I guess

about fifty feet beyond the other side of the track, south side of the track.

"Q. On which crossing of Walton avenue was he struck? A. He was struck on the west side.

"Q. He was going from the north side of Delmar to the south side? A. Yes, sir; on the west side of Walton.

"Q. Was he going in a direct line right direct across the street? A. *Yes, sir; going right straight across the street.*"

On cross-examination, Edwards said he could not see what the motorman was doing because the curtain was down; that, seated on the north or right hand side in the second or third seat, he was looking out towards the front. Then the following occurred:

"Q. And you saw a man coming south on Walton avenue? A. Yes, sir.

"Q. He was walking on the west side of the street, was he? A. Yes, sir.

"Q. And you saw him as he was leaving the sidewalk? A. Yes, sir.

"Q. Now, how far was it from the car track to where you saw him leaving the sidewalk? A. It was about 12 feet, I guess.

"Q. About 12 feet? A. I guess so.

"Q. And your car was then how far away? A. About 150 feet away, I guess, something like that, when I first saw him leaving the sidewalk.

"Q. This gentleman walked twelve feet toward the car while the car was running 150 feet? A. Yes, sir.

"Q. And they met right on the west crossing, didn't they? A. Yes, sir.

"Q. That is where the accident occurred? A. Yes, sir.

"You didn't see the man when he got up to the

track, did you, you couldn't see him then for the curtain? A. No, sir, I couldn't see him for the curtain, but I saw him when he stepped from the sidewalk.

"Q. *But after that he was lost to your view?* A. *Yes, sir.*

"Q. *You couldn't see him after he left the sidewalk?* A. *No, sir.*

"Q. *On account of the curtain?* A. *Yes, sir.*

"Q. *You don't know what he did after he left the sidewalk, up to the time of the accident?* A. *No, sir.*

"Q. You don't know what happened? A. No, sir.

"Q. Did you see him looking towards the car? A. No, sir.

"Q. Now Joe, are you sure about that? A. Yes, sir, I am positive.

"Q. You are positive that you didn't see him looking towards the car? A. No, sir.

"Q. Did he stop after he walked up there, as if to get on the car? A. No, sir.

"Q. You didn't see him stop after he left the sidewalk, where passengers usually stop when they want to get on the car? A. Yes, sir.

"Q. Did you or not? A. No, sir, I didn't see him stop.

"Q. Now, you are sure of that? A. Yes, sir.

"Q. You didn't see him walk up there and stand until the car got almost to him, and then stop on the track, did you? A. No, sir.

"Q. You are sure about that? A. Yes, sir.

"Q. Did you notice the motorman begin to slacken up the speed of the car while he was east, on the east side of Walton avenue, before he got to Walton avenue? A. No, sir, I didn't notice.

"Q. You didn't notice that, you say now that the car was running about twenty-five miles an hour? A. Yes, sir.

Rodan v. St. Louis Transit Co.

"Q. And you are sure about that? A. Yes, sir.

"Q. You say now that the bell was not ringing? A. No, sir.

"Q. You are also sure about that? A. Yes, sir.

"Q. Did it seem to you that this man thought he could get in front of the car and tried and was struck? A. No, sir, it did not seem to me that way.

"Q. You testified as a witness at the inquest before the coroner, didn't you? A. Yes, sir.

"Q. You were sworn there to tell the truth, the whole truth, and nothing but the truth, were you? A. Yes, sir.

"Q. And you testified there as a witness? A. Yes, sir.

"Q. A stenographer wrote down your testimony before the coroner, didn't he? A. Yes, sir.

"Q. And after you had gone away for a day or two you went back there and signed it? A. I never went back no more after the first time.

"Q. You didn't go back after the first day? A. No, sir.

"Q. That was on the 30th day of November, that you went before the coroner, wasn't it? A. I don't know, sir, what date it was.

"Q. Well, it was two days after the accident, wasn't it? A. Yes, sir, I guess about two days after.

"Q. And your recollection was better then than it is now, wasn't it? A. No, sir, my recollection is better now than it was then.

"Q. How do you account for that; Joe, wouldn't it be better a day or two after the accident than five or six months after? A. Not being accustomed to going before him at the coroner's inquest I got a little excited down there and my testimony was not exactly the way it should have been.

"Q. Your testimony before the coroner was not

true? A. Not exactly, by being a little scared at the time.

"Q. Why were you scared down there, there was no lawyer there cross-examining you, the deputy coroner asked you questions there, didn't he? A. Yes, sir.

"Q. And you answered the questions and did you answer those questions truthfully at that time? A. No, sir, not exactly truthful.

"Q. Not exactly truthful at that time? A. No, sir.

"Q. How do you know that you did not answer the questions truthfully at that time, has your attention been called to that testimony since? A. No, sir, I have not been down there since.

"Q. No, but has anybody talked to you about what you swore to before the coroner? A. No, sir.

"Q. Do you remember what you testified to down there? A. No, sir, I don't think I do, I can't remember what I did say.

"Q. Why do you say that you did not answer the questions truthfully down there? A. By being a little scared a person would say most anything that was never before a coroner.

"Q. There were not one-quarter as many people in the coroner's office as there are in the court room here, were there? A. No, sir.

"Q. And it was the second day or about the second day after the accident, wasn't it? A. Yes, I think it was about the second day.

"Q. There was no lawyer cross-examining you, or examining you, the coroner asked you a few questions, what was there to excite you? A. Nothing at all.

"Q. Who has talked to you about your testimony since you testified before the coroner? A. No one has talked to me.

"Q. Nobody has spoken to you about it? A. No, sir.

"Q. Not a word; now, when you were before the coroner, I will ask you to state if you were not asked, 'Were you on the west-bound car on the morning of November 28th?' and didn't you answer, 'Yes, sir?' A. Yes, sir.

"Q. And were you not asked then, 'Did you strike a man at Delmar and Walton?' and did did you not say, 'Yes, sir?' A. Yes, sir.

"Q. 'Where were you?' and did you not answer, 'Two seats in the front of the car?' A. Yes. sir.

"Q. 'Did you see any of it?' and did you not answer, 'Yes, sir?' A. Yes, sir.

"Q. 'What did you see?' and in answer to that question didn't you testify there as a witness, 'The man was standing like he wanted to get on and then he crossed in front of the car, the car got so near him the car was slacked up and the motorman thought may be he wanted to get on, it looked like he wanted to get on,' did you testify to that before the coroner? A. Yes, sir.

"Q. Then you were asked, 'Did he see the car coming?' and didn't you answer there, 'Yes, sir; he stood there until the car got very near to him,' didn't you make that answer there? A. Yes, sir.

"Q. 'Was he looking up at the car?' and didn't you say in answer to that, 'Yes, sir; it looked like he wanted to get on,'—did you make that answer? A. Yes, sir.

"Q. Speak a little louder, Joe. A. Yes, sir.

"Q. 'Did he step in front of the car as the car got near to him?' and didn't you make this answer, 'Yes, sir; it looked like he tried to cross in front of the car?' A. Yes, sir.

"Q. You made that answer there under oath as a witness; were you not asked this question, 'Which

side of the car hit him?' and did you not answer, 'It looked like the north part of the car hit him,'—you made that answer? A. Yes, sir.

"Q. Then you were asked this question, 'The motorman slackened up?' A. 'Yes, sir,'—did you testify to that before the coroner? A. Yes, sir.

"Q. Speak a little louder, and won't you take your hand down so that the jury can hear you? 'Q. How far away was he then?' Now, did you make this answer, 'The motorman commenced slacking up on the east side of Walton as he was going to the west'—you made that answer there, did you? A. Yes, sir.

"Q. 'Was he going fast? A. Not so extra fast,' did you make that answer? A. Yes, sir.

"Q. Then were you asked this question, 'Was he ringing the bell?' A. 'Yes, sir; the bell was ringing all right;' did you make that answer? A. Yes, sir.

"Q. You made that answer there under oath as a witness before the coroner; were you then asked this question, 'It seemed to you as if he thought he could get in front of the car and tried to and the car hit him? A. Yes, sir;' did you say in answer to that question, 'Yes, sir?' A. Yes, sir.

"Q. Were you then asked this question, 'Which side of the car were you sitting on? A. On the north side of the car,'—did you make that answer? A. Yes, sir.

"Q. Were you asked this question, 'You had a plain view of him? A. Yes, sir; from the lights on the corner;'—did you make that answer? A. Yes, sir.

"Q. Then you were asked, 'There was nobody sitting in front of you?' and did you answer, 'No, sir; nobody at all?' A. Yes, sir.

"Q. Now, you made those answers to questions asked you by the coroner on the 30th of last Novem-

ber, two days after the accident while testifying as a witness, did you? A. Yes, sir.

"Q. Speak a little louder. A. Yes, sir.

"Q. And you were sworn as a witness there just as you were here? A. Yes, sir.

"Q. You held up your hand and took the oath to tell the truth and nothing but the truth, did you? A. Yes, sir.

"Q. And that was your testimony before the coroner as I have read it to you, is that true? A. Yes, sir."

Having put in the Vigilant Watch Ordinance and the Speed Ordinance and proved the allegations of her petition pertaining to said ordinances, plaintiff rested.

Defendant introduced no testimony and asked and was refused one instruction, a peremptory one.

Among the instructions given for plaintiff was one, numbered 7, as follows:

"The court instructs the jury, that unless you find from the evidence that Philip Rodan, the deceased, did not look and listen, before going upon defendant's track, on the occasion of his death, then you are instructed that you are at liberty to presume that on said occasion he did look and listen for an approaching car before going on said track of defendant."

Among the grounds presented in the motion for a new trial was error in the giving of the foregoing instruction. As said, the court sustained said motion, filing a written opinion as follows:

"The defendant's motion for a new trial must be sustained because of the giving of instruction numbered 7 asked by the plaintiff.

"That instruction, in substance, told the jury that they might presume the deceased looked and listened for the car unless they found he did not look and listen. This instruction in the absence of any evidence as

to what he actually did in the way of looking and listening before going on the tracks would be good under the authority of Railroad v. Landrigan, 191 U. S. 461, and Riska v. Railroad, 180 Mo. 168, cited by plaintiff's counsel. In the case at bar, one of plaintiff's witnesses, Joe Edwards, testified on direct examination that when he first saw deceased he was going south on Walton, saw him leave the sidewalk and go on across, paying no attention because there was nothing to attract attention to the car, the gong not being sounded. Here was an explicit statement that this witness was looking at the deceased and the latter went across paying no attention to the car. This is positive, not merely negative, testimony as in the Riska case.

"In the light of Edwards' admissions, on cross-examination, as to what he had stated before the coroner, just the opposite of much that he said at this trial, it is possible the jury paid no attention to the testimony above quoted. It suffices for the purposes of this motion that this testimony was before the jury, and with it in the case the said instruction numbered 7 ought not to have been given. The motion for a new trial is sustained for the reason assigned."

If the reasons given, *nisi,* for the ruling are good, it will not be necessary to cast about for other reasons sustaining that ruling, or consider others pressed here by defendant's learned counsel.

Was the court right in granting a new trial on the reason given? We think so, because:

(a) In the first place, *in limine,* it must be assumed as a commonplace of the law, arising to the level of an axiom, that the granting of a new trial rests within the sound discretion of the trial court; and its action in that behalf will not be disturbed on appeal unless it appears that its discretionary power was abused, *i. e.,* exercised in an arbitrary or improvident

manner. [R. S. 1899, sec. 800; and see first note under that section, Ann. St. 1906, 761, where the authorities are gathered.]

(b)   Keeping in view the foregoing propositions and attending to the testimony of Edwards, it will be seen that plaintiff introduced testimony from him unquestionably directed to proof of a fact, to-wit, that decedent did not look and did not listen. The significance of this crops out when it is recalled that Edwards is the only eye-witness. He puts himself in the shoes of one who, looking out of the windows on the north side of the car with eyes to the front where Rodan was, sees him leave the curb and go straight across the tracks, and "pay no attention," and his eye follows him to the very instant of his stepping on the track. He says he could see the man "approach the track." When asked if he saw him "as he stepped on the track?" He answers: "Yes, sir." The witness goes so far even as to give the reason Rodan had for not looking, to-wit, that there was nothing to attract attention to the car—no warning signal.

If the testimony of this witness at the inquest (developed on cross-examination) be looked at as substantive evidence, then it is apparent he was stating under oath that Rodan did look and did see the car before taking the last fatal step into danger and death. But, of course, the testimony before the coroner was not substantive evidence, the force of this part of the cross-examination was spent in showing contradictory statements, to impeach the witness.

Edwards in further cross-examination evidently took the curtains in front of the car as stumbling-blocks and (confronted by them) there comes a palpable hitch in his testimony. A change comes over its tenor and he testifies he did not see Rodan after he left the curb, quite losing sight of the side windows through which he was looking forward an instant be-

fore. In this state of the proof it must not be lost sight of that he was plaintiff's witness. By the act of putting him on the stand she vouched for his truthfulness, stood sponsor for his credibility, invited the jury to believe him as one without spot or guile, and could not (if she would) turn about and impeach him or strike him down. One may not drink from a spring and then roil it, or from a pitcher and then break it. If A put B on the stand and prove by him a certain state of facts, this does not preclude A from putting C, D or E on the stand and proving a different state of facts; but if A puts B on the stand as his only witness to prove a fact, and does prove it, then he is precluded from impeaching B, or from otherwise inviting the jury to disregard B's testimony. He may not avoid his dilemma in that way.

Instruction numbered 7 does that very thing. It recognizes there was testimony that Mr. Rodan did not look and did not listen. It says to the jury, in effect: You are at liberty to presume that Mr. Rodan did look and listen for a car before going on the track, unless you find from the evidence he did not look or listen. If this was not a hint, a roundabout but persuasive suggestion, to the jury to blink or discard the testimony of plaintiff's witness, Edwards, and indulge a presumption based on the absence of his testimony, what was it?

Indulging an hypothesis and coming into the open, suppose (defendant putting in no proof) plaintiff had asked and got an instruction to this effect: If the jury believe the testimony of Edwards, in his examination in chief, then you should find that decedent did not look and listen before he stepped on the track. But the jury are further instructed in this behalf that you are not bound to take the statements of any witness as true; you are at liberty to discard false testimony. If, therefore, you believe Edwards' testimony

in chief was false or that his testimony on cross-examination is true, then there is no evidence in the case that decedent did not look or listen; and, with that evidence absent, you are at liberty to presume decedent did look and listen. Could that or a like instruction be sustained on reason or authority? And yet the instruction given headed the same way and was a covert invitation to the jury to discard Edwards' testimony in chief in order to presume a fact based on the absence of such testimony and advantageous to plaintiff's case.

Observe, we are not dealing with a case where plaintiff put in no evidence tending to show decedent did not look and listen; nor are we dealing with a case in which a doubt creeps in through the door of defendant's testimony. The law of such a case, therefore, concerns us not. We are dealing with a case in which the plaintiff is apparently trying to get away from a part of her own testimony and recover on the theory that it may (or ought) not to be believed by the jury—a case in which the jury are invited to indulge a presumption that Rodan was exercising due care, and, in exercising it, he either did not see the car when he looked or hear it when he listened, or that, seeing and hearing, he could not tell in the uncertain light how fast it was approaching and had the right to presume it traveled at ordinance speed, in which event, he was in no danger in going on his way and crossing. In this view the instruction was wrong and the ruling of the trial court well enough.

(c) The conclusion reached in the foregoing paragraph is sustained by other reasons. For example, the basic principle upon which presumptions are built is philosophically related to the doctrine of faith. Now, faith, says Paul, is the substance of things hoped for, the evidence of things not seen. [Heb. 11:1. q. v.] "Presumption," says Mathews (Mat. Presum. Ev. 1), "is

a principle of law, by which, for the furtherance and support of right, facts not established by positive evidence are inferred from circumstances." That is, where the thing itself is unseen and unknown, in a close sense, it may yet be deemed seen and known in the light of the knowledge of mankind based on frequent occurrence and found from experience to be generally accordant with truth. A presumption, therefore, of a rebuttable character, such as here, only remains in force until repelled by contrary evidence. It follows that when the evidence is contrary to the presumption invoked, the presumption itself cannot be laid hold of for use in administering justice in a particular case. Take a familiar illustration: A presumption of death arises under certain circumstances, on the lapse of a given period of time; yet that presumption could not be invoked by plaintiff in a case where plaintiff's evidence showed the man alive. That the foregoing rule governing the use of rebuttable presumptions is steadily applied, is beyond question. For instance:

In Weller v. Railroad, 120 Mo. l. c. 650, this court said: "In the absence of evidence, did the jury have a right to draw the inference that deceased did what common prudence and ordinary care demanded of him? The rule of law that ordinary care requires a traveler at a railway crossing to look up and down the track, when the view is unobstructed, before venturing to cross it, is drawn from the ordinary conduct of the average of mankind in the daily affairs of life. From the same source is deduced also a correlative rule that, *in the absence of direct evidence or rebutting circumstances,* one, in attempting to cross a railroad track, will be presumed to have been in the exercise of proper care. [Petty v. Railroad, 88 Mo. 320; Schlereth v. Railroad, 115 Mo. 87; Crumpley v. Railroad, 111 Mo. 158.] In this case, had there been no witness to the

conduct of deceased, and it had been shown that defendant was negligent in failing to comply with the ordinance requiring the train to carry a light, then the jury might have drawn the inference that deceased looked for a train, and failed to see on account of the default of those in charge of the train.''

In Hutchinson v. Railroad, 161 Mo. l. c. 255, it was held that if decedent, *without knowing and without being able to discern the speed of the train,* had assumed it was running at a less rate (to-wit, the ordinance rate) and, acting on that assumption, had attempted to cross as she did, the court would have been justified in adjudging her negligent, unless there was some other fact in the case to justify her assumption. In that case there was another fact, to-wit, the city speed ordinance, and we held that, in the absence of proof that she knew or had reason to apprehend the contrary, the law will presume that she trusted, as she had the right to trust, that defendant was obeying the law.

In Bragg v. Railroad, 192 Mo. l. c. 352, 353, it was said: ''In many cases this court has asserted the general proposition that one may safely act upon the presumption that operatives of street cars and steam cars are obeying proper and reasonable speed regulations, but the doctrine is subject to a qualification and that qualification is that no such presumption can be indulged, or acted upon, where it is seen and known that such cars, in a given case, are proceeding in violation of the regulation. In such case the legal purpose to be conserved by the presumption does not exist.''

In Mockowik v. Railroad, 196 Mo. l. c. 571, 572, we said: ''That presumptions have no place in the presence of actual facts disclosed to the jury, or where plaintiff should have known the facts had he exercised ordinary care, is held in many cases.''

In other cases it has been held that it is not nec-

essary to rebut the presumption by positive testimony. It may be rebutted by the proofs of circumstances, which, remaining unassailed, make the presumption inapplicable. So in Green v. Railroad, 192 Mo. 131, a presumption of due care was invoked; but on the facts disclosed it was held inapplicable. [L. c. 141, *et seq.*] It was there said: "There is in this case no ground on which to construct a rational presumption that the deceased trusted that the engineer was obeying the ordinance. There is no evidence on which we can base a finding that she saw the engine at all until in a moment of peril. It was imminently, dangerously close when she stepped on the track."

The Green case was followed by the Mockowik case, supra; and by Stotler v. Railroad, 204 Mo. 619, where a line of cases are cited and reviewed. The same doctrine was announced in Schmidt v. Railroad, 191 Mo. 215. See, also, Railroad v. Landrigan, 191 U. S. 461, where the rule was formulated that "in the absence of evidence to the contrary there is a presumption that one who is killed while crossing a railroad track at night stopped, looked and listened before attempting to cross the track."

In the light of the foregoing cases instruction numbered 7 was erroneous; for, assuming, as we have the right to do, that Mr. Rodan was *sui juris* and that he had full possession of his sense of sight and sense of hearing, then, considering his position on the curb in relation to the oncoming car, the state of the light, the absence of confusing conditions, the plain view, the evidence of Edwards and all the other circumstances of the case, the instruction was out of place and the court's ruling was also well enough for the reasons just stated.

The judgment must be affirmed. It is so ordered. All concur.