CARROLL W. BATTLES et al., Respondents, v. UNITED RAILWAYS COMPANY OF ST LOUIS, Appellant.

St. Louis Court of Appeals, December 2, 1913.

1. **TRIAL PRACTICE:** Demurrer to Evidence: Effect of Introducing Evidence After Demurrer Overruled. By introducing evidence after its demurrer to the evidence, offered at the close of plaintiff's case, is overruled, defendant takes the chance of curing any defect or supplying any omission in the case as made by plaintiff, but does not waive the right to have the ruling reviewed.

2. **NEGLIGENCE:** Proximate Cause: Violation of Municipal Ordinance. It is axiomatic, in the law of negligence, that, in order to warrant a recovery, a causal connection must be established between the injury or loss suffered and the negligence charged, and this is true even though the negligence charged be the violation of a municipal ordinance.

3. **STREET RAILWAYS:** Violation of Speed Ordinance: Proximate Cause. The fact that a street car is running at a rate of speed prohibited by a municipal ordinance, at the time it strikes and injures a person, raises no presumption that the injury was caused by such excessive speed, but, in order to support an action, it should appear that the injury would not have occurred if the car had been running at a rate of speed within the ordinance limit.

4. **NEGLIGENCE:** Proximate Cause: Evidence. It is not necessary that a causal connection between the injury or loss suffered and the negligence charged be shown by direct and positive testimony, but it is sufficient if such connection be made to appear by reasonable and fair inference from facts and circumstances established in evidence.

5. **STREET RAILWAYS:** Death of Pedestrian: Violation of Speed Ordinance: Proximate Cause. In an action by parents for the death of their nine-year-old boy, resulting from his being struck by a street car, where nothing was shown beyond the fact that decedent was struck by the car and that the car was running at a greater rate of speed than the maximum prescribed by a municipal ordinance, *held* that plaintiffs were not

entitled to recover on the negligent speed theory, since there was no showing that the injury would not have occurred had the car been running at a rate of speed within the ordinance limit, and hence the vital link necessary to couple the injury with such excessive speed was missing.

6. **TRIAL PRACTICE: Demurrer to Evidence: Rules of Decision.** In considering a demurrer to the evidence, plaintiff is to be accorded the benefit of every reasonable inference that may be fairly drawn in his favor from the facts in evidence, and the evidence must be considered in the light most favorable to him.

7. **STREET RAILWAYS: Death of Pedestrian: Violation of Speed Ordinance. Proximate Cause.** In an action by parents for the death of their nine-year-old boy, resulting from his being struck by a street car, where nothing was shown beyond the fact that decedent was struck by the car and that the car was running at a greater rate of speed than the maximum prescribed by a municipal ordinance, *held* that such a condition at the place of the accident was not shown to have existed as would justify the inference that the motorman ran the car at an excessive rate of speed, at a time and place when and where he should have known that children were congregated or playing, and hence plaintiffs' point, that a causal connection between the injury and the excessive speed was established, on the theory that proof that the car was propelled at an excessive rate of speed through a neighborhood in which many children lived and frequented the street inferentially established such connection, could not be sustained.

8. ———: ———: ———: ———. In an action by parents for the death of their nine-year-old boy, resulting from his being struck by a street car, nothing was shown by plaintiffs, beyond the fact that decedent was struck by the car and that the car was running at a greater rate of speed than fifteen miles per hour, the maximum rate prescribed by a municipal ordinance. Defendant's evidence showed that decedent ran from behind a moving eastbound car, which hid him from the view of the motorman on the westbound car, immediately in front of the latter car and in such close proximity to it that it was impossible for the motorman to stop it in time to avoid injuring him. *Held*, that a reasonable inference could not be drawn from the evidence that the car would not have struck and killed decedent, if it had been running at the rate of fifteen miles per hour, or even at a considerably lower rate of speed and one which in no way could be held to be negligence, and hence a causal connection between the injury and the excessive speed was not established.

9. **NEGLIGENCE:    Proximate Cause:    Evidence:    Conjecture.** In order to establish that the negligence alleged was the proximate cause of his injury, plaintiff must get his case out of the fog of conjecture and plant it on the basis of fact.

10. **STREET RAILWAYS:    Failure to Sound Gong at Crossing: Negligence Per Se.** The failure of a motorman to sound a warning as a street car is approaching a crossing is negligence *per se.*

11. **———: Death of Pedestrian: Failure to Sound Gong.** Where a boy ran from behind a moving eastbound car, which hid him from the view of the motorman on the westbound car, immediately in front of the latter car, which struck and killed him, and the accident happened in daylight at a place where there was no crossing and where the motorman had every reason to expect a clear track, *held* that the failure of the motorman to sound the gong was not negligence, since it was not his positive duty to sound the gong at that place and there was no showing that he had any reason to anticipate the need of sounding it.

12. **———: ———: ———:    Proximate Cause.** Where a boy ran from behind a moving eastbound car, which hid him from the view of the motorman on the westbound car, immediately in front of the latter car, which struck and killed him, and the accident happened in daylight at a place where there was no crossing and where the motorman had every reason to expect a clear track, *held* that, in view of the fact that the evidence disclosed that the motorman on the westbound car could not have discovered decedent's position in time to sound a warning, and that, after decedent darted in front of the car, the sounding of the gong could not have averted the disaster, the failure to sound the gong was not the proximate cause of the injury.

13. **———: ———:    Defective Fender:    Sufficiency of Evidence.** In action for the death of a small boy by being struck by a street car, evidence *held* not to show that there was such an impact of the body against the front of the fender as to cause it to automatically drop, and hence its failure to drop did not show that it was defective or out of order.

14. **———: ———:    Emergency Acts.** Where a boy ran from behind a moving eastbound car immediately in front of a westbound car, and the motorman on the latter car had only an instant in which to act, and he honestly attempted to prevent injury to the boy by trying to stop the car, believing that was the best thing to do, and not having time both to do that and lower the fender, it cannot be said that he was negligent in not lowering the fender, although he may have erred in judgment.

15. **NEGLIGENCE: Emergency Acts.** When one has only a brief interval of time in which to act, and, acting under the stress of excitement and the impending danger, honestly attempts to prevent injury by doing a certain thing, he should not be condemned for failing to do more than he did, and he is not guilty of negligence, although he erred in judgment in doing what he did.

16. ————: **Death: Contributory Negligence: Presumption.** The rule that it is presumed that a decedent was in the exercise of ordinary care at the time he met his death is a presumption of fact, and as such it disappears upon the appearance of the facts, so that where eye-witnesses to an accident reveal the facts and circumstances attending the same, there is no room for the indulgence of the presumption.

17. ————: **Contributory Negligence of Children.** To the extent that a child of tender years knows and understands a danger, or where the danger is of such a character that it must be obvious to one of his years, a legal duty rests upon him to avoid it, and if he fail to do so, he may be declared negligent as a matter of law.

18. **STREET RAILWAYS: Death of Child: Stepping in Front of Car: Contributory Negligence.** A nine-year-old boy, who was evidently familiar with the operation of street cars, ran from behind an eastbound car, which hid him from the view of the motorman on the westbound car, immediately in front of the latter car, which struck and killed him. *Held,* that his death was proximately caused by his own negligence.

Appeal from St. Louis County Circuit Court.—*Hon. Gustavus A. Wurdeman,* Judge.

REVERSED.

*Boyle & Priest* and *T. E. Francis* for appellant; *J. C. Kiskaddon* of counsel.

The court erred in refusing to direct a verdict for defendant, for the reason that the alleged omissions of duty counted on were either unproved, did not constitute negligence, or else were not the proximate cause of the accident. (a) The alleged operation of the car at a speed in excess of the maximum rate prescribed by ordinance was not the proximate cause of the acci-

dent, inasmuch as decedent went upon the track immediately in front of the car and the collision would have been inevitable had the car been running within such maximum rate. Bluedorn v. Railroad, 121 Mo. 258; Evans Brick Co. v. Railroad, 17 Mo. App. 624; Molyneux v. Railway, 81 Mo. App. 25; King v. Railroad, 211 Mo. 1; Schmidt v. Transit Co., 140 Mo. App. 182. (b) Inasmuch as there was no law or ordinance requiring a gong to be sounded and the accident did not occur at a street crossing or place where pedestrians would be expected to cross the street, the failure to sound the gong was not an act of negligence. McGauley v. Transit Co. 179 Mo. 583; Theobald v. Transit Co., 191 Mo. 395. (c) A recovery could not be predicated on the manner in which the car was equipped with a fender inasmuch as—First, there was no law or ordinance requiring the installation of such equipment, and it was not negligence at common law to fail to install such equipment; and it follows as a necessary corollary that it was not actionable negligence to fail to keep such equipment, if installed, in a state of good repair. If it was not negligence to have no fender at all, *a fortiori* it was not negligence to have an imperfect one. Hogan v. Railroad, 150 Mo. 36. Second, there was no showing that the fender actually installed was not as efficacious in operation as any other obtainable, or that it was not in a perfect working condition. (d) A recovery could not be predicated on the theory that the motorman could have averted the injury to decedent by lowering the fender, because the evidence shows that decedent got on the track immediately in front of the car, and the motorman, therefore, did not have time to lower the fender before decedent got under the wheels. It requires a showing of more than a mere possibility of ability to avert the accident to warrant a recovery on such a theory as this; and in this case not even a possibility was shown. White v. Railroad, 159 Mo. App. 508; McGee v. Railroad, 214 Mo.

530; Markowitz v. Railroad, 186 Mo. 350; Hawkins v. Railroad, 135 Mo. App. 524; Roenfeldt v. Railroad, 180 Mo. 567. Even if the facts would warrant a finding that decedent might not have been killed, had the fender been lowered, still a recovery could not be predicated on the failure to lower it, since the motorman earnestly and honestly did all he could to save the life of decedent, by stopping the car as quickly as possible, and if he erred in trying to stop the car, instead of lowering the fender, such error, having been committed under the stress of exciting and imminent danger, was not proof of negligence. Matthews v. Railroad, 156 Mo. App. 715; White v. Railroad, 159 Mo. App. 508.

*Francis M. Curlee* for respondents.

(1) There is a presumption that decedent was at the time of the accident in the exercise of ordinary care. Buesching v. St. Louis Gas Light Co., 73 Mo. 219; Schultz v. Moon, 33 Mo. App. 329; Weller v. Railroad, 120 Mo. 635; Dunlap v. Mallinckrodt Chem. Works, 159 Mo. App. 49; Schlereth v. Railroad, 96 Mo. 509; Hanlon v. Railroad, 104 Mo. 381. (2) A child of tender years can not be said as a matter of law to be guilty of contributory negligence. This is a question of fact for the jury. Holmes v. Railroad, 190 Mo. 98. (3) It is not necessary to plaintiff's case, to produce an eye witness who saw the accident itself. Causal connection may be proven directly or inferentially like any other fact. Keim v. Railway, 90 Mo. 314; King v. Railroad, 211 Mo. 1; Buesching v. Gas Light Co., 73 Mo. 219; Schultz v. Moon, 33 Mo. App. 329; Schlereth v. Railroad, 96 Mo. 509; Prewitt v. Railroad, 134 Mo. 627; Hanlon v. Railway Co., 104 Mo. 381; King v. Railroad, 211 Mo. 1. (4) Defendant's evidence is not proof. Where plaintiff makes a prima-facie case, the truth of defendant's evidence is always a question for the jury. Gannon v. Laclede Gas Light Co., 145 Mo.

502.   (5)   Even though plaintiff does not make a prima-facie case, and defendant's demurrer to plaintiff's evidence is overruled, where defendant fails to stand on his demurrer, and introduces his evidence, the demurrer is waived and the evidence is considered as a whole.   Riggs v. Railway Co., 216 Mo. 304; Klockenbrink v. Railway Co., 81 Mo. App. 351.   (6)   The question of whether or not due care required the ringing of a gong, in the particular circumstances, is à question of fact to be decided by the jury.   Schmidt v. Railroad Co., 163 Mo. 645; Conrad v. Railway, 89 Mo. App. 391; Noll v. Transit Co., 100 Mo. App. 367; Baxter v. Transit Co., 103 Mo. App. 597; Zander v. Railroad, 206 Mo. 470; Koenig v. Union Depot Co., 173 Mo. 698; Frank v. Transit Co., 99 Mo. App. 323.   (7)   Under the rule of *res ipsa loquitur,* evidence of the usual and ordinary operation of a device, and of its failure so to operate, creates a presumption of defective construction or condition, and casts the burden of proof on the operator of the device to show its proper construction and condition.   Scheurer v. Rubber Co., 227 Mo. 347; Blanton v. Dold, 109 Mo. 64; McCarty v. Railroad, 105 Mo. App. 596; Lee v. Railroad, 112 Mo. App. 372.   (8) The burden of proof is on that party who has the information in his possession—Spark arrester case, Miller v. Railway Co., 90 Mo. 393.

ALLEN, J.—This is an action instituted by respondents, husband and wife, for the death of their minor son, Shelby Battles, through the alleged negligence of the defendant.   Plaintiffs recovered, and the defendant prosecutes the appeal.

Respondents' minor son met death by being struck and run over by one of defendant's street cars in the city of Maplewood, St. Louis county, on Manchester avenue, a public street of said city, on October 31, 1910, at about eleven o'clock a. m.

## THE PLEADINGS.

The petition, which is quite lengthy, counts upon several different theories of negligence.

The first assignment of negligence charges, in substance, that the car which struck and killed deceased was being operated at the time at an "excessive, dangerous and unlawful rate of speed," and one that was negligent at common law, in view of the fact that it was being operated through a thickly populated portion of the city of Maplewood, and which was much frequented by children.

The second charge of negligence is that defendant's motorman, in charge of the car which struck and killed deceased, was negligent in failing to sound a gong or bell as the car approached and passed another car going in the opposite direction, upon an immediately adjacent and parallel track.

The third assignment of negligence charges a violation of a municipal ordinance of the city of Maplewood, in that the car which struck and killed deceased was being operated at a rate of speed in excess of fifteen miles per hour, in violation of said ordinance.

The fourth assignment of negligence charges a violation of another ordinance of said city of Maplewood, requiring street cars to be equipped with fenders "projecting from the front platform of all said cars, and designed to catch and sustain any human being who may be in the way of said car."

The fifth assignment of negligence also charges defendant with a failure to equip its cars with a fender of the design required by the municipal ordinance aforesaid, and that in lieu thereof defendant had equipped the car in question with a fender of a different character and design, describing the latter; and it is alleged that the device which defendant thus adopted was defective in design and construction, and ineffective to accomplish the results intended by the ordinance.

The sixth assignment of negligence also charges a violation of the ordinance respecting the equipment of cars with fenders; and charges that the defendant had undertaken to provide and equip its said car with a device or guard intended to accomplish the same result as was intended by said ordinance viz., to catch and sustain any person in the way of and struck by said car, but it is charged that the defendant negligently failed to keep such device or guard in working order and condition, and permitted it to become broken, defective and out of order, whereby it failed to operate and by reason whereof the deceased was drawn under the car and killed.

The seventh charge of negligence is, in substance, that the defendant's motorman in charge of the car which struck and killed deceased could have lowered the fender with which the car was equipped, by operating a certain lever, in time to have prevented the injury and killing of deceased, and negligently failed so to do.

The answer is a general denial, and a plea averred that the deceased was killed through his own negligence and inevitable accident.

## PLAINTIFF'S CASE.

Manchester avenue, at and about the point where plaintiffs' son was struck and run over by defendant's car, extends east and west, the central portion of the street being, at the time, occupied by double, parallel street car tracks of the defendant, which extended west to Sutton avenue where they turned to the south along the latter street. Plaintiffs' son, a boy of nine years of age, was struck by a west-bound car on Manchester avenue, between two cross streets, viz., Sutton avenue on the west and Arthur avenue on the east, and run over and killed; his body being dragged some distance west. The evidence discloses that the car which struck

him did not carry passengers, but was an "express car," which made but few stops.

Plaintiffs offered no eyewitness to the accident; that is to say, none of plaintiffs' witnesses saw the boy before he was struck by the car. Some of them heard the crunching and grinding noise made by the car when the motorman thereof attempted to stop it, their attention being attracted thereby, and saw a cloud of dust raised by the car in thus coming to a stop. And two witnesses testified to seeing the boy's hat fly in the air at this time. Other witnesses for plaintiffs only saw the car after it had stopped. The testimony of plaintiffs' witnesses, and which is undisputed, was that when the car came to a stop the boy's body was under the rear wheel of the forward truck of the car, on the south rail of the west-bound or north track; and that he was then dead, and his body frightfully mangled.

Plaintiffs' evidence went to show that the boy was struck by the car in front of the Banner Lumber Company's building, situated on the north side of Manchester avenue, and that after striking him the car dragged his body west until it come to a stop about opposite Mrs. Ray's restaurant or lunch room, also situated on the north side of the street. Plaintiffs' evidence was that the distance which the car thus ran after striking the boy, before coming to a stop, was about one hundred and sixteen feet.

The testimony of plaintiffs' witnesses was to the effect that the car was going quite rapidly at the time that it struck the boy, though much of this was by way of conclusions or opinions of the witnesses, who used such expressions as, "Awful fast;" "very fast;" "much faster than ordinary." One witness, however, estimated that the car was running from twenty to twenty-five miles per hour. This witness stated that he first saw the car when it was east of Arthur avenue; that his attention was attracted to it because of its rapid speed; that he came out of Mrs. Ray's res-

taurant, or lunch room, and started to cross the street, when he hesitated on account of the speed with which the car was approaching; that he saw a passenger car going east on the other or south track, and which passed the west-bound express car, but that though he was looking east toward the approaching express car, he did not see it strike the boy; that he saw a cloud of dust rise from the car, opposite the Banner Lumber Company's building, and noticed that the car began to slacken speed, and he then proceeded on across the street.

One witness said that the car was going twice as fast as she had ever seen passenger cars run in that neighborhood. And another witness testified passenger cars ordinarily ran along there about fifteen miles per hour—sometimes as high as twenty.

Witnesses for plaintiff who were near the scene of the accident testified that they heard no bell or gong sounded. It was shown that this part of Manchester avenue was a mixed business and residence street of the city of Maplewood, frequented by children, especially by those attending a school some blocks west.

On behalf of plaintiff there was testimony that the car was equipped with a fender; that the latter consisted of two parts, one part, the bumper, being made of perpendicular slats extending along the front end of the car, and the other part being underneath the platform in front of the trucks, and which was referred to as an apron or scoop.

It was shown that the latter normally stood seven or eight inches above the street, and could be lowered by the motorman by pulling "a handle." And there was testimony to the effect that, after the car in question had stopped, this "apron" or "scoop" stood in its normal position, indicating that it had not been lowered.

An ordinance of the city of Maplewood was introduced in evidence limiting the speed of street cars to

fifteen miles per hour.   The ordinance of said city pro-
viding that street cars should be equipped with fenders
of a certain design was also introduced, but the court,
at the instance of the plaintiffs, charged the jury not to
considered the provisions of that ordinance in arriving
at a verdict.

Such was the case made for plaintiffs.

## DEFENDANT'S EVIDENCE.

On behalf of defendant several eyewitnesses to the
tragedy were produced.   One of these was a boy ten
years of age, who had been a playmate of plaintiffs'
deceased son.   This witness was riding on a bicycle
along the north side of Manchester avenue, about op-
posite the Banner Lumber Company's building, at the
time of the accident.   He testified that he saw Shelby
Battles on the lower step of the east-bound car; that
the latter got on this car just as it came around the
curve at Sutton avenue, the next street west, and where
the car had stopped to take on passengers; that when
this east-bound car got opposite the Banner Lumber
Company's place, the deceased jumped off of the car
and ran behind it toward the north; that he passed
about a foot or two feet behind the rear end of the
east-bound car, and ran directly in front of the west-
bound car at about two feet from it; that "the two cars
were even when he got hit" meaning that the front end
of the west-bound car was about even with the rear end
of the east-bound car when the boy was struck.   The
witness stated that the deceased "grabbed for the
window, and just as he missed the window he hollered,
and the car knocked him."   He stated that he meant
the front window of the express or west-bound car, i. e.,
a window in the vestibule around the front platform
thereof.   He stated that the express car had stopped
east of Arthur avenue, at a dairy, which it appears was
about four hundred and ten feet from the point where

the boy was struck. He said that the car was going quite rapidly, however, when it struck the boy, and that the witness heard no bell or gong.

The motorman in charge of defendant's west-bound car testified that at the time of the accident it was proceeding, in his judgment, at about the rate of ten or twelve miles per hour; that he had stopped at the dairy east of Arthur avenue; that he sounded the gong at the crossing of the latter street, and that he also sounded it as the east-bound car approached and passed him; that the first that he saw of plaintiffs' son was just when the front end of his car became even with the rear end of the east-bound car; that the boy came around from behind the east-bound car, and that the witness didn't see him until he was about two feet from the west-bound car, when the boy dropped on the track, striking the fender, going under the car along the south rail. The motorman further testified that, upon seeing the boy, he immediately "reversed the car;" that the wheels began to grind and threw up dust as high as the car; that when he felt the reverse "take," he was afraid that he might back the car over the boy and he applied the air brakes; and that he thought that the car came to a stop in "about a car length, or a car length and a half," the car being about thirty-eight feet long; that when the car came to a stop, the boy's body was under the second wheel of the front truck on the south rail of the west-bound car, and that the car had to be moved slightly forward to extricate it.

The motorman testified that he did not drop the fender. He explained in a general way the construction of the fender, which went to show that the portion thereof extending across the front of the car was intended as a sort of bumper; and that the latter was connected with a wheel guard, which plaintiffs' witnesses referred to as an "apron" or "scoop;" that a

fender of this design is intended to operate automatically, so that when something hits the front portion or bumper it will cause the wheel guard, underneath the platform of the car and immediately in front of the front wheels, to drop to the track; but that the wheel guard may also be operated by a lever in reach of the motorman on the car. The witness testified that he had never theretofore had an occasion to drop this wheel guard, and that he did not attempt to do so at the time in question. In this connection he stated, on direct examination, that the boy was under the car before he could operate the fender, saying: "The whole thing happened in a couple of seconds from the time I saw the boy until the time I ran over him." On cross-examination he said that the fender could be operated or dropped by giving it a little jerk, pulling it a few inches, though the handle of the lever to be used therefor was situated lower than the air brake and "controller." In cross-examination he was pressed to state why he did not pull the lever and drop the fender. A portion of his testimony was as follows:

"Q. Now, why did you not pull that lever and drop that fender? A. I told you I did not think I had time, the boy was out of sight so fast and I just thought I would make the stop.

"Q. You thought you could stop in that distance? A. I thought I had better try to make the stop. .

"Q. You saw the boy disappear, as you say, under the car? A. I knew I could not stop.

"Q. Then why did you not lower the fender? A. I reversed the car; I didn't know that I would go over him at all.

"Q. You thought you had time to stop the car so that you would not go over him? A. Yes, sir.

"Q. Then why did you not lower the fender? A. Just like I told you, I didn't have the time. . . .

"Q. You just didn't think about it? A. I just didn't have the time, I thought I would rather try, I better try to stop the car.

"Q. Even though you saw him going down? A. I never saw the boy until he was about two feet away from me right in front of my car.

"Q. That is the only explanation you can give as to the reason why you did not drop that fender under the circumstances? A. Of course I did not think I had time, I thought I would do better by stopping .

"Q. Even under the circumstances in which you saw that boy? A. Yes, sir; it was just as I say, he was only a foot or two away from me when I saw him. . .

"Q. If you hadn't attempted to stop you would have had plenty of time? A. If I just dropped the fender?

"Q. Yes, sir? A. I could not do the both things in just a second."

Respecting the manner in which the boy was struck, as bearing upon the automatic opueration of the fender, the motorman, on direct examination, testified that the boy "dropped on the track and went under, hit the fender, and the boy went right down on the south rail." On cross-examination, on being questioned in regard to the fact that the fender had not worked automatically, he said: "It didn't have no chance;" that "just his hand was hit by the fender;" that the boy was on the south rail and seemed to sink down upon the track, before the car itself struck him; and that he didn't see the fender strike any part of his body. On redirect examination he said: "His little hand just hit the corner of the fender; and his other hand hit the bumping thing out in front; it is below the outside of the fender; his one hand hit that and the other hit the fender."

A young man named Aubrey Koelling, a witness for defendant, testified that he was standing in front of a tin shop just east of the Banner Lumber Company's building; that his attention was first attracted

by the ringing of the bell or gong of the west-bound car as the latter was passing the east-bound car; that he stepped from where he was first standing to a little hallway or alley-way between the Banner Lumber Company's building and the building immediately east thereof; that he saw the deceased run behind the east-bound car directly in front of the express car; that the boy "just sunk right down and fell on the south track, just laid his one hand on the fender and the other hand on an iron piece that comes around the fender, underneath the fender; and I heard him scream;" that the deceased "was no more than two or three feet from the car when he sunk." This witness testified that the west-bound car was running a little faster than the ordinary passenger car, and, as he thought, about ten or twelve miles per hour.

Mrs. Anna Grant, a witness for defendant, testified that she walked along Sutton avenue, and then turned into Manchester avenue, at which time she saw two little boys on a bicycle, and deceased running along near the bicycle; that the east-bound car then passed, stopping at the Sutton avenue crossing to take on passengers; that the boys on the bicycle crossed over the tracks to the north side of the street, but that the deceased kept running along the south side thereof near the car, which was proceeding east at a moderate rate of speed; that she watched the boy, and the conductor of that car, who was on the back platform, and that the boy, instead of jumping on the car, suddenly "dodged back of the car and the first thing I saw him on the ground." That the boy got no farther than the south rail of the west-bound track; that she had not noticed the west-bound car until "the boy got right against it;" "his little left hand, I saw that just in motion like that, but his little right hand I did not notice at all; he just hesitated like that and that was the end of it, it just went as quick; when I looked I just, well it was done so quickly I could not tell it or express it."

Again this witness says that the deceased "dodged the car (meaning the east-bound car) and went right in front of the express car." And again she said "he dodged back of the car and run into the other car, it wasn't a second of doing the whole performance." And she stated that "the back of the passenger car and the front part of the express car just came on a level there, just as the boy ran in front of it." She stated that she heard no bell or gong, but that all of her attention was directed to the boy's movements.

Frank Derkoviz, a barber, was a witness for defendant. He testified that he was standing in his barber shop on the south side of the street; that he saw deceased pass on the step of the east-bound car, and that he saw him jump down about the middle of "the block and run behind that car in front of the express car. He said that the boy ran perhaps two or three feet behind the passenger car, across the track; that "he got kind of excited, and I saw him at the same time he run right under the car himself; he could not miss the car, and in less than a second that happened;" that the boy ran perhaps two or three feet in front of the express car. When asked as to how the boy fell, he said: "I don't know myself; when he was going towards the car, I mean the express car, I saw him just so, when he had gone so far I got kind of excited, he was so scared because he could not go back, he was too close to the express car." This witness said that he did not hear any bell or gong, but could not say that one was not sounded "for he paid no attention to that;" that the express car was "going pretty fast."

On cross-examination the witness stated that, when he first saw the boy, he became excited, thinking that the boy would be killed, and that at that instant his telephone rang, and he says: "I run to the 'phone but I could not answer the 'phone, I come right away back and I see that car was stopped and he was under the car. He could not escape, he was too close to the

car." And in response to a question as to how for the express car was away when he started to answer the telephone, he said: "It was right on him, but I never knew myself whether what to do, where to go first, there or to the telephone . . . when he started to run (it) was two or three feet, I don't know because I never was measuring that, but that was about the distance."

*Of the demurrer to the evidence:*

1. The defendant offered a peremptory instruction in the nature of a demurrer to the evidence, at the close of plaintiffs' case, which the court refused, and in like manner interposed a demurrer to the evidence at the close of all the evidence in the case, which was also overruled.

Respondents now say that, since appellant failed to stand upon its demurrer offered at the close of the plaintiff's case, and proceeded to put in its own evidence, it thereby waived the demurrer to plaintiffs' evidence, and that all of the evidence must now be considered in reviewing the action of the trial court in permitting the case to go to the jury. This is quite true. That is to say, appellant, in introducing evidence after the overruling of its demurrer at the close of plaintiffs' case, took the chance of curing any defect or supplying any omission in the case as made by plaintiffs; it did not, however, waive its right to have the court's ruling reviewed, but, touching that question, the whole evidence is now to be looked to, no matter by whom offered. [See Klockenbrink v. Railway Co. 172 Mo. 678, 72 S. W. 900; Graefe v. Transit Co., 224 Mo. 232, 123 S. W. 835; Weber v. Strobel, 236 Mo. 649, 139 S. W. 188; Milem v. Freeman, 136 Mo. App. 106, 117 S. W. 644; Bailey v. Dry Goods Co., 149 Mo. App. 656, 129 S. W. 739; Hitt v. Hitt, 150 Mo. App. 631, 131 S. W. 369.]

II. Respecting the rate of speed at which the car was being propelled at the time that it struck plaintiffs' son, the evidence, as we have seen above, was con-

flicting. However, the evidence adduced by plaintiffs tended to show that the car was being operated at a rate of speed in excess of that* permitted by the ordinance, and at a speed which the triers of fact would perhaps have been justified in finding to be negligent, in view of the circumstances, regardless of the ordinance.

Had the evidence properly connected the striking and killing of plaintiffs' son with this alleged negligence on the part of defendant, the issue would undoubtedly have been one for the jury, on this phase of the case. But it is axiomatic in the law of negligence that a causal connection must be established between the injury or loss suffered and the negligence charged. In other words, a recovery cannot be had unless it appear that the injury sustained resulted proximately from the negligence complained of, and which is the basis of plaintiffs' action. [See Kelley v. Railroad Co., 75 Mo. 138; Warner v. Railroad, 178 Mo. 125, 77 S. W. 67; King v. Railroad, 211 Mo. 1, 109 S. W. 671; McGee v. Railroad, 214 Mo. l. c. 544, 114 S. W. 33; Schmidt v. Transit Co., 140 Mo. App. 182, 120 S. W. 96.]

And this is true even though the negligence charged is the violation of a municipal speed ordinance. [King v. Railroad Co., Schmidt v. Transit Co., supra.] For the fact that a car is run at a rate of speed prohibited by an ordinance, at the time one is injured by it, raises no presumption that the injury was caused by such excessive speed. [Schmidt v. Transit Co., supra; Bluedorn v. Railroad Co., 121 Mo. 258, 25 S. W. 943; Kelley v. Railroad Co., supra.] As is said in Schmidt v. Transit Co., supra, l. c. 187, "in order to support the action, it should appear that the injury would not have occurred if the car were running at a speed within the ordinance limit."

However, it is not necessary that such causal connection be shown by direct and positive testimony; it

is sufficient if it be made to appear by reasonable and fair inference from facts and circumstances established in evidence. [See Schmidt v. Transit Co., supra l. c. 187; Stotler v. Railroad Co., 200 Mo. l. c. 135, 136, 98 S. W. 509, and cases cited.]

In the case before us, it is quite clear that the evidence adduced on behalf of plaintiffs wholly failed to establish any causal connection between the alleged excessive speed of the car and the killing of plaintiffs' son. Not only was there no direct and positive testimony tending to show that the injury would not have occurred had the car been running at a rate of speed within the ordinance limit, or at a rate which could not be found to be negligent at common law, but there were no facts or circumstances in evidence from which this could be fairly and reasonably inferred. From plaintiffs' evidence, as detailed above, it will be readily seen that so far as concerns this phase of the case, nothing was shown respecting the killing of plaintiffs' son, beyond the fact that he was struck and killed by the car, coupled with testimony tending to show that the car was being propelled at the time at an unlawful rate of speed. Manifestly this alone was insufficient to entitle plaintiffs to recover, for the vital link is missing necessary to couple the injury with the negligence sought to be established, and to show that the latter was the proximate cause of such injury.

Learned counsel for respondents invoke the aid of friendly presumptions and inferences, which counsel say may be drawn from the facts and circumstances in evidence, in aid of plaintiffs' case. It is clear, however, that no presumption can be indulged to supply the causal connection between the injury and the negligence charged; for indeed no such presumption obtains. [Schmidt v. Transit Co., supra.] So far as concerns the inferences to be drawn from the facts developed by plaintiffs' evidence, it is elementary that, in considering the demurrer to the evidence, plaintiffs are

to be accorded the benefit of every reasonable inference which may be fairly drawn in their favor from the facts in proof, and furthermore, that the evidence must be considered in the light most favorable to them. However, giving plaintiffs the benefit of every possible inference, which could in any manner be said to be fairly deducible from the proof offered, and viewing their evidence in the light most favorable to them, it is impossible to glean therefrom any proof of a causal connection between the accident and the alleged negligent speed of the car. On the contrary, so far as concerns plaintiffs' evidence, the record is barren of anything to supply that necessary link.

The contention is made, in effect, that such causal connection was established inferentially by the showing made by plaintiffs respecting the character of the neighborhood through which the car was being propelled at the time and the testimony that many children lived thereabout and frequented the street. This is upon the theory that the motorman in charge of the car knew, or should have known, of the likelihood that children would be upon the street at that time, and that proof that the car was propelled at an excessive rate of speed through such a district raises an inference that the injury inflicted upon this child resulted proximately from such excessive and negligent speed.

The difficulty with this, however, aside from other considerations, is that the evidence, taken in its entirety, failed to show such condition with respect to the use of the street at this place, at least at the time in question, as would support plaintiffs' theory in this regard. In the first place, it is not contended that the street was a narrow and congested one, such as may be found in the heart of a more populous city. On the contrary, the evidence adduced tends to show that the street is one of considerable width; and it does not appear that there was any heavy or congested traffic thereupon by pedestrians. It is true that it was shown that quite a num-

ber of children lived in the neighborhood thereabout; that the Maplewood school was located some few blocks west, and that many children used this thoroughfare in passing to and from school. However, it was not shown that such school children were so passing at the time, and this doubtless for the reason that the accident occurred at about eleven o'clock on Monday, October 31, 1910, a time and hour of the day when school children are not likely to be passing to and from school. And it was not, in fact, shown that many children were upon the streets or even the sidewalks at that time. Indeed it cannot well be inferred from the evidence touching this question that there were any children actually out in the street itself near the scene of the accident, at the time when it occurred, except plaintiffs' son and two boys who it seems were riding a bicycle, and certainly no other than plaintiffs' son shown to be near the car tracks; though there was testimony that a few others were on the sidewalks in the vicinity at that time. A condition was therefore not shown to exist such as would justify the inference that the motorman ran the car at an excessive rate of speed at a time and place when and where he knew, or should have known, that children were congregated or playing in the street and about the car tracks.

Turning to defendant's evidence, respecting this phase of the case, it is quite clear that there was nothing adduced in its evidence which supplied the causal connection in question. Quite on the contrary, the defendant's evidence, which we have detailed above and which we need refer to but briefly here, went to show that the unfortunate child ran or dodged behind the moving east-bound car, which screened and hid him from the view of the motorman of the express car, immediately in front of the latter car, and in such close proximity thereto that it was impossible for the motorman thereof to avoid striking and injuring him; that, in so running, he merely reached a point about or near

the south rail of the west-bound track, when he was immediately struck by or sank and went down under the south corner of the front portion of this car, and was thereby killed. From the testimony of defendant's witnesses, detailed above, it is quite clear that what happened took place in a very brief interval of time—in the twinkling of an eye, as it were. Such is the sworn testimony of the disinterested eyewitnesses to the accident, very closely corroborating the testimony of the motorman in this regard. Manifestly this testimony of the only eyewitnesses produced to the accident lends no aid to plaintiffs' theory that the injury could have been averted had the car been proceeding at a lawful rate of speed. Granting that the car was proceeding at a rate of speed in excess of the ordinance, certainly defendant's testimony had no tendency whatever to show that the boy could have escaped injury and death had the car been running within the ordinance limit. In view of the testimony respecting the rapid movement of the child in running to the north across the track, it is only reasonable to suppose that the lapse of a further brief interval, would merely have placed him directly in front of the central portion of the express car. In other words, there is no reasonable inference that can be drawn that the car would not have struck and killed him, as it did, had it been running at a rate of speed less than fifteen miles per hour, or even at a considerably slower rate of speed and one which could in no way be held to be negligent.

It is urged that had the car been proceeding less rapidly, the little fellow might have dodged back and saved himself. And stress is laid upon the testimony of the deceased boy's playmate, who said that plaintiffs' son grabbed for the window in the front of the car; upon the theory that had the car been running at a lawful rate of speed, this last desperate effort of the little fellow, as related by this witness, might have

been successful, and that this was a question for the consideration of the jury. We cannot accede to this, however, in view of all the evidence in the case. The most that we can say of it is that it rests upon conjecture and speculation, and as said in McGee v. Railroad, supra, "to get to the jury plaintiffs must get their case out of the fog of conjecture and plant it on the basis of fact." [See, also, Giles v. Railway, 154 S. W. 1. c. 855.] This burden was upon the plaintiffs in this case. And we would be highly remiss in the performance of our duty were we to permit a verdict to stand based simply upon conjecture as to what might possibly have happened. In fact, as we have said, the evidence respecting the movements of the boy tended only to show that in all probability he would have simply been cast more directly in the path of the oncoming car had the latter been running at a somewhat slower rate of speed, and it would appear that he could not have escaped unless the car had been but very slightly in motion.

Some stress is also laid by learned counsel for respondents upon the testimony of two of defendant's witnesses, from which it is sought to draw the inference that the motorman saw or could have seen the boy in time to avert the injury, and thus make this a question for the jury. This has reference, in part, to the testimony of the witness, Aubrey Koelling, to the effect that, after his attention was attracted by the ringing of the bell or gong of the west-bound car, as the latter was passing the east-bound car, he went from where he as first standing, in front of the tin shop, to the hallway just next to the Banner Lumber Company's building, from which position he saw the boy run in front of the car which killed him. It is argued that, if the witness had time to do this, it was a question for the jury to say whether or not the boy would have had time to escape if the car had been running at a lawful rate of speed. The difficulty about this, however, is that, ac-

cording to the witness's testimony, the ringing or clanging of the gong, which attracted his attention, occurred when the west-bound car began to pass the other car—and to this extent corroborates the testimony of the motorman that he did sound the gong at such time. It is true that the witness says that he stepped to the hallway in question because he heard the bell ringing rapidly, indicating, as he thought, that something was wrong. However, it was shown that the express car was equipped with a gong which made a louder noise or clang than that of the ordinary passenger car, and it could not be inferred, from the mere fact that the gong was sounded in quick succession in approaching and passing the east-bound car, that the motorman saw the boy at that time, or had any reason to suppose that he would run in front of his car. On the contrary, if the testimony of the several witnesses is to be believed, the boy was in such position that he was then completely hidden from the motorman's view by the east-bound car. And the physical facts lend no aid to the drawing of any such inference, in view of the fact that, though the little fellow evidently darted quickly to the north, he merely reached the nearer rail of the west-bound track. And, in any view of this evidence, there was nothing to indicate that the car could have been stopped or the injury averted had it been proceeding at a slower rate of speed; leaving this question at best to the purest conjecture.

The other witnesses to whose testimony our attention is directed in this same regard was Frank Derkoviz, the barber, who testified that just as he saw the boy's danger his telephone rang, and he started to answer it; that he did not do so, but left the telephone to see what was happening to the boy. And it is urged that if this witness had time, after seeing the impending danger, to go to the telephone, it was a question for the jury to say whether or not the boy would have had time to get out of the way of the car, had it been

running at a lawful rate of speed. This overlooks the fact, however, that the witness after stating that he ran to the telephone, but did not answer it, said: "I come right away back and I see the car was stopped, and he was under the car." From this it is quite evident that, when the witness returned from the telephone, the whole thing was over and the car had been brought to a stop some distance down the street. And hence the inference which is sought to be drawn from the testimony of this witness is by no means deducible therefrom.

A very careful and painstaking examination of the record has convinced us that there was nothing adduced to establish a causal connection between the killing of plaintiffs' son and the alleged negligent speed of the car, and that, therefore, so far as concerns this charge of negligence, plaintiffs failed to make out a case entitling them to go to the jury.

III. We pass now to the consideration of the charge of negligence with respect to the alleged failure of the motorman in charge of the car which struck and killed plaintiffs' son to sound a gong or bell as the car approached and passed the passenger car proceeding in the opposite direction on the other track.

The point at which these two cars passed was in the block on Manchester avenue between the two cross streets above referred to. It was nearer Arthur avenue, the eastern intersecting street, but still a considerable distance west of that crossing. At the time that the cars passed each oher, both were in motion, and, so far as the evidence discloses, there was nothing to give any warning to the motorman in charge of the west-bound car that any one was upon the street in the vicinity of either track, or of the probability that any one would leave the moving east-bound car and come upon the track in front of him. On the contrary, it appears that the motorman had every reason to ex-

pect a clear track, and it was broad day light, and his view down the track was unobstructed.

Respondents do not contend that there was any ordinance requiring a bell or gong to be sounded at this place, nor that any positive duty was cast upon the motorman to ring a bell or gong, so that the violation thereof would be negligence *per se,* but they do contend that the circumstances and conditions here shown to exist were such as to make this a question for the jury. And in this connection we are cited to the rulings in Schmidt v. St. Louis R. R. Co., 163 Mo. 645, 63 S. W. 834; Conrad v. Ry., 89 Mo. App. 391; Noll v. Transit Co., 100 Mo. App. 367, 73 S. W. 907; Baxter v. Transit Co., 103 Mo. App. 597, 78 S. W. 70; Zander v. R. R., 206 Mo. 470, 103 S. W. 1006; Koenig v. Union Depot Co., 173 Mo. 698, 73 S. W. 637; Frank v. Transit Co., 99 Mo. App. 323, 73 S. W. 239. An examination of these cases, however, will disclose that in each instance the facts and circumstances in evidence differ quite widely from those here appearing. From the evidence, as we have stated it above, it will be seen that the only thing which could be said to cast any duty upon the motorman to give warning of the approach of his car was the bald, bare fact that it was approaching and about to pass a car in motion and going in the opposite direction. It is not a case where the motorman failed to give warning of the approach of his car at a crossing, nor where he was proceeding at a rapid rate of speed through darkness, or where his view was obstructed, and where he had reason to apprehend the presence of persons or vehicles on the track ahead of him, nor where he was passing a stationary car discharging or taking on passengers and might anticipate that persons would come from behind such car in front of his own. No such situation, nor anything of like character, presents itself here. On the contrary if we are to hold that the defendant could be convicted of negligence because of a failure

to ring a bell or sound a gong, we must be prepared to plant such holding solely upon the ground that a duty was cast upon defendant to sound a gong as this car passed another moving car—the latter moving, as it appears, rapidly enough to raise no suspicion that a passenger would attempt to leave it and thus come upon the other track.

In Theobald v. Transit Co., 191 Mo. 1. c. 482, 90 S. W. 354, the court said: "The place of accident was one hundred and fifty feet west of Union avenue, and there is nothing in the statement which tends to even cast a duty upon the defendant to sound a gong at the point, it not being an intersecting street and the presence of the wagon on the street not being known." [See, also, McGauley v. Transit Co., 179 Mo. 1. c. 592, 79 S. W. 461.]

Had the car in question been approaching a crossing, the matter would be altogether a different one, and under many circumstances the failure to thus sound the warning of approach is negligence *per se.* [Koenig v. Union Depot Ry. Co., 173 Mo. 725, 73 S. W. 637.] Undoubtedly, under many other circumstances and conditions, the court should refer to the jury the question of whether or not a motorman is negligent in failing to thus give warning of the approach of his car; but the court should not submit this question as a predicate of liability where neither the proof shows a positive duty to give such warning, nor that the motorman had any reason whatsoever to anticipate the need of giving warning to any one. Here, as we have said, so far as appearances went, the street was clear before him; and certainly the motorman had no reason to suspect that plaintiffs' son or any one else, under such circumstances, would suddenly dart from behind another moving car.

It must be borne in mind that we are dealing alone with the duty which was owing to plaintiffs' son, under the circumstances of this particular case. That he

was either upon the lower step of the east-bound car or running along near the same is undisputed. Nearly all of the eyewitnesses said that he was on the car step. At any rate, it is quite clear that he could not then be seen by the motorman of the west-bound car, or his later sudden movements anticipated. If the motorman sounded his gong as he approached the other car, as he said he did, it does not appear that it was because of the presence of the boy on or near the rear step on the farther side of the east-bound car. There is no evidence that the boy's presence there was known to the motorman, but all of the evidence touching this question goes to show that the latter could not have discovered the boy's position in time to sound a warning. And when the little fellow darted in front of the oncoming car, obviously neither gong nor emergency brake could have averted the disaster. And under such circumstances, manifestly the failure to sound a gong could not be the proximate cause of the injury, but the latter must be referred to the act of the unfortunate child in suddenly darting immediately in front of the moving car.

We are, therefore, of the opinion that the case could not go to the jury upon this assignment of negligence.

IV. The negligence charged and sought to be established with respect to the fender of the car proceeds upon two different and distinct theories. One of these relates to the failure of the fender to operate automatically and thus prevent plaintiffs' son from going beneath the wheels of the car and being killed. Plaintiffs took out of the case the ordinance respecting the installation and operation of fenders. Plaintiffs' theory, however, is that, since defendant undertook to equip its car with an automatic device of this character, it became its duty to keep the same in good order and working condition; and it is contended that the failure of the fender to operate automatically and the

apron or wheel guard beneath the car to drop and catch and sustain plaintiffs' son, was evidence that the mechanism of the fender was broken, out of order or defective. Respondents proceed upon the theory that the doctrine of *res ipsa loquitur* here applies, and refer us to such cases as Blanton v. Dold, 109 Mo. 64, 18 S. W. 1149; Scheurer v. Banner Rubber Co., 227 Mo. 347, 126 S. W. 1037; McCarty v. Railroad, 105 Mo. App. 596, 80 S. W. 7; Lee v. Railroad, 112 Mo. App. 372, 87 S. W. 12.

It is argued that the fact that the motorman testified that plaintiffs' deceased son "hit the fender," and the failure of the device to thereupon act in the manner in which it was designed to operate, showed prima facie that it was defective, broken or out of order. And on this evidence this theory of negligence was presented to the jury by an instruction. There is not a scintilla of evidence otherwise to show that there was anything wrong with the fender.

Without conceding respondents' theory to be tenable at all, in a case of this character, it is sufficient for the purpose of this case to say that the evidence did not even reveal that the boy struck the fender in a way which was designed to cause it to operate automatically. It is true that the motorman stated that the boy "hit the fender," but this was later explained, as we have shown above, when the motorman said that the boy's "little hand just hit the corner of the fender; and his other hand hit the bumping thing in front, it is below the outside of the fender." And this is fully corroborated by the witness, Aubrey Koelling, who stated that the boy "just laid his one hand on the fender and the other hand on an iron piece that comes around the fender, underneath the fender." This being the only evidence on that subject, there was clearly nothing to give rise to any inference that the fender was broken, defective or out of order, merely because

it failed to operate automatically; for it was not shown that there was such an impact of the boy's body against the front portion of the fender as would or should cause it to operate automatically, as it is claimed it was intended to do.

V. The other theory of negligence respecting the fender is predicated upon the failure of the motorman to operate it by means of a lever at his command when the boy ran in front of the car. Touching this question, we have detailed above, somewhat at length, the testimony of the motorman. And, as to this assignment of negligence, it is sufficient to say that the motorman cannot be convicted of negligence in failing to lower the wheel guard, under the circumstances, when it is plain that he had but an instant in which to act, and that, acting upon impulse, he did that which his judgment told him to do. It appears that he immediately "reversed" the car; later applying the air brakes. He testified that he did not have time to both reverse the car and operate the lever to lower the fender; and indeed the evidence makes it appear that he had but the very briefest interval of time in which to do anything. And if he erred in judgment when so acting, under the stress of excitement and the impending danger, such error constitutes no proof of negligence. That he honestly attempted to prevent injury to the boy is quite evident, and he should not be condemned for failing to do more than he did. Many cases might be referred to in this connection, but the following will suffice: Matthews v. Railway Co., 156 Mo. App. 715, 137 S. W. 1003; White v. Railroad, 159 Mo. App. 508, 141 S. W. 436.

It follows that it was error to submit the case to the jury upon this theory of negligence as was done by the lower court.

And thus a consideration of the various assignments of negligence makes it quite clear, we think, that plaintiffs failed to make out a case entitling them to a

judgment of a jury thereupon. The accident was a most distressing one, and plaintiffs' loss irreparable; but courts have stern duties to perform, and where, as here, no actionable negligence is shown, liability cannot be cast upon a defendant no matter how serious may be the injury and loss to the plaintiff. Under the facts disclosed by this record, it is clear that the trial court should not have permitted the case to go to the jury; for it is evident that plaintiffs' minor son met his injury and death either through inevitable accident or his own negligence.

VI. In the view which we take of the case, as shown above, it is unnecessary for us to dwell at length upon the question of the child's own negligence, Respondents say that the deceased must be presumed to have been exercising ordinary care at the time, invoking the doctrine which has been applied in Buesching v. Gas Light Co., 73 Mo. 219, and other cases of that character. Of this it is sufficient for us to say that the presumption, which is often indulged, that decedent was in the exercise of ordinary care at the time he met his death, does not here obtain; and a discussion of the many interesting cases that might be referred to in this connection would here serve no useful purpose. This is for the reason that presumptions of this character are presumptions of fact; and such a presumption takes flight and disappears from the case altogether upon the appearance of the facts themselves. The latter leave no room for the presumption. Had there been here no eyewitnesses to the injury and death of plaintiffs' son, such presumption could properly be invoked, and the plaintiffs could rely thereupon. However, as we have seen, there were a number of eyewitnesses to the accident, and they have revealed the facts and circumstances attending the same, thus putting the presumption out of the case. [See Mockowik v. Railroad, 196 Mo. 550, 94 S. W. 256; Higgins v. Railway Co., 197 Mo. l. c. 317, 95 S. W. 863;

Stotler v. Railroad, 204 Mo. 619, 103 S. W. 1; Rodan v. Transit Co., 207 Mo. 392, 105 S. W. 1061; Tetwiler v. Railroad, 242 Mo. l. c. 194, 145 S. W. 780.]

It is also urged by respondents that whether or not this child used such care as would reasonably be expected of one of his years and capacity, under like circumstances, is a question for the jury; and in this regard respondents rely upon Holmes v. Railroad, 190 Mo. 98. But more recent cases are to the effect that a child, even though of quite tender years, may be held to understand and comprehend certain dangers, and may be held guilty of negligence as a matter of law. In the case before us, the evidence is quite meager touching the child's knowledge of the danger in question. Defendant offered to show that this boy had knowledge thereof, and that he had been warned concerning the same. This however, the lower court excluded, upon objection thereto, upon the ground that it had *"no bearing on this case."* But it does appear that he resided in that immediate neighborhood, and was evidently familiar with the operation of these very cars, and that he was in the full possession of all his faculties. Though he was but nine years of age he must have known and been able to appreciate the danger of placing himself immediately in front of a moving car. The danger to be apprehended therefrom is within the easy comprehension of a child of his age familiar with the operation of such cars. To the extent that a child knows and understands a danger, or where the latter is of such a character that it must be perfectly obvious to one of his years, a legal duty rests upon him to avoid it; and failing to do so, he may be declared negligent as a matter of law. [See Herdt v. Koenig, 137 Mo. App. 589, 119 S. W. 56; McNulty v. Railroad, 166 Mo. App. 439, 148 S. W. 973; Hight v. Bakery Co., 168 Mo. App. 431, 151 S. W. 776; McGee v. Railroad, supra.]

Each case must necessarily rest largely upon its own facts. Here, as we have said, the death of plaintiffs' son must be regarded as having been proximately caused either by inevitable accident or his own negligence. Under all the facts shown in evidence we think that it is properly to be attributed to the latter.

It is unnecessary to notice other assignments of error. The judgment must be reversed, without remanding the cause. It is so ordered. *Reynolds, P. J.,* and *Nortoni, J.,* concur.